2003-NMCA-003

62 P.3d 754

**GEORGIA O'KEEFFE MUSEUM,**
**Plaintiff–Appellant,**

v.

**COUNTY OF SANTA FE, et al.,**
**Defendants–Appellees.**

No. 22,202.

Court of Appeals of New Mexico.

Oct. 2, 2002.

MacDonnell Gordon, Rodey, Dickason, Sloan, Akin & Robb, P.A., Kurt A. Sommer, Sommer, Fox, Udall, Othmer & Hardwick, P.A., Santa Fe, NM, for Appellant.

Christopher L. Graeser, Deputy County Attorney, Santa Fe, NM, for Appellees.

## OPINION

SUTIN, Judge.

{1} The opinion filed in this case on September 30, 2002, is withdrawn and the following opinion is substituted therefor.

{2} The Georgia O'Keeffe Museum, a private corporation (O'Keeffe), protested the assessment of property tax by the County of Santa Fe (the County), claiming an exemption for its museum property under New Mexico Constitution Article VIII, Section 3. The County Valuation Protests Board (the Board) upheld the assessment on the ground that O'Keeffe "failed to produce sufficient competent evidence" that "a substantial use, and the primary use, of the ... property is charitable or educational." O'Keeffe appealed the denial, paid the assessment under protest, and filed a complaint for refund of the taxes it paid. After consolidation of the refund action with the appeal, the district court affirmed the Board on the exemption

denial and dismissed the refund action upon the County's motion for summary judgment. We reverse and remand for further proceedings on the exemption issue. We affirm the dismissal of the refund action.

## BACKGROUND

{3} O'Keeffe is a New Mexico non-profit corporation and a tax exempt organization under the Internal Revenue Code, 26 U.S.C. § 501(c)(3). One of O'Keeffe's stated purposes is to "maintain property, including a building and museum collections, for the operation of a museum devoted primarily to the exhibition of the works of Georgia O'Keeffe." Another is to "promote and encourage public awareness of, interest in and appreciation of its collections and ... engage in such educational programs as are consistent with the operation of a museum." O'Keeffe's museum is situated on Johnson Street in Santa Fe, New Mexico (the museum property). O'Keeffe has allocated about sixty percent of its annual budget for what it deems educational purposes.

{4} O'Keeffe applied for an exemption from taxation of the museum property for the year 1999 under the "educational or charitable purposes" exemption contained in Article VIII, Section 3 of the New Mexico Constitution, which reads in pertinent part:

> The property of the United States, the state and all counties, towns, cities and school districts and other municipal corporations, public libraries, community ditches and all laterals thereof, all church property not used for commercial purposes, all property used for educational or charitable purposes, all cemeteries not used or held for private or corporate profit and all bonds of the state of New Mexico, and of the counties, municipalities and districts thereof shall be exempt from taxation.

The County Assessor denied the exemption application and O'Keeffe filed a protest with the Board. After a hearing, the Board entered a Decision and Order upholding the Assessor's denial of the exemptions for educational and charitable use.

### O'Keeffe's Evidence at the Board Hearing

{5} O'Keeffe's director of education testified regarding its programs and activities, several of which are also illustrated in documents. We summarize this evidence which relates to the operation of the museum only during the period 1997 to 1999.

{6} *On–Site:* The museum opened in 1997 and is open six days per week. O'Keeffe collects, houses, and publically displays artworks by Georgia O'Keeffe, and operates a retail gift shop. Over 665,000 persons visited the museum in the two years following its opening, the majority of whom paid an entrance fee.

{7} In the museum, visitors receive a brochure that discusses significant events in Georgia O'Keeffe's life. Orientation tours for the general public are available thirty hours a week. Educational tours for school children are regularly conducted on Mondays when the museum is closed to the public. Student tours are given to about three thousand students each year. Less regularly, lectures are held, students from an elementary school visit the museum (three times per year) in conjunction with a primarily off-site art education program, tours are given for persons with disabilities, and teacher workshops are held for Santa Fe area teachers. O'Keeffe funds visits by students and teachers as exhibitions change at the museum.

{8} O'Keeffe also provides pre- and post-museum visit educational material to give students "a richer and deeper experience." Further, O'Keeffe provides "hands on lessons in the galleries with teachers and students," and conducts a Saturday family program (once a month during the school year and twice a month during the summer) to encourage children to become lifelong museum visitors. The family program begins at the museum, teaching the children to develop critical thinking skills and to articulate what they have experienced, and continues at another location for practical lessons.

{9} *Off–Site:* O'Keeffe conducts or participates in a substantial number of educational programs and activities that occur away from the museum property. For example, O'Keeffe, as part of its professional development program in art education: produces teacher lesson plans; conducts workshops

and teaching programs for instructors in art education; offers professional development and art leadership experience programs for girls and young women; works with a city summer therapeutic recreation program for kids with disabilities; and conducts or is involved in various other educational and mentor programs. O'Keeffe also has office space on Grant Avenue in Santa Fe, where it often conducts educational programs.

{10} Through several of its programs and activities, O'Keeffe reaches out to local communities around the state, conducting courses and workshops in conjunction with universities and schools. O'Keeffe also sponsors lectures; operates senior citizen programs; donates materials and supplies to schools, teachers, and libraries; and carries on a year-round university intern program, as well as a docent program that trains adults. For its plentiful programs and activities, O'Keeffe produces several types of resource materials and supplies for study in conjunction with artwork at the museum, for career development in the arts (e.g., art conservation, art criticism, art education, art therapy), for instruction on how museums operate to use Georgia O'Keeffe's life as an educational tool (e.g., as part of New Mexico history), and for use in art education generally.

{11} Further, O'Keeffe has a resource library containing books about Georgia O'Keeffe and other contemporary artists, and donates books to repositories such as college and public libraries. In addition, O'Keeffe donates seventy-five percent of its one-day pass revenue to the Museum of Fine Arts and the Museum of New Mexico, and eighty percent of its four-day pass revenue to the Museum of New Mexico. Both of these museums are state owned and operated.

**What Is "Use for Educational Purposes"?**

{12} Both parties rely on *NRA Special Contribution Fund v. Bd. of County Comm'rs*, 92 N.M. 541, 591 P.2d 672 (Ct.App. 1978), for the standard for determining whether the museum property is used for educational purposes:

[W]e hold the phrase "used for educational purposes" to mean "the direct, immediate, primary and substantial use of property that embraces systematic instruction in any and all branches of learning from which a substantial public benefit is derived."

*Id.* at 548, 591 P.2d at 679. "[I]t is the direct and immediate use of the property ... and not the remote and consequential benefit derived from its use" that governs. *Id.* at 546, 591 P.2d at 677. "Substantial public benefit" means "[a] benefit of real worth and importance to an indefinite class of persons who are a part of the public, which benefit comes to these persons from the use of property." *Id.* at 549, 591 P.2d at 680.

{13} O'Keeffe asks this Court to apply the *NRA* standard broadly, eschewing requirements of a regular, structured, and active, on-site direct teaching and learning environment. The County asks this Court to adhere to the narrowly tailored results reached by the Board and the district court from measuring the evidence strictly against the language of the *NRA* standard, to reject any off-site activity and any notion of inherent educational value.

{14} The trial court in *NRA* granted the Special Contribution Fund (the Fund) an educational-purposes exemption. The Fund was a non-profit trust that qualified for a § 501(c)(3) exemption. Its property was used for the following:

(a) Teaching of survival and conservation schools, camps and training, to the general public, with instruction provided by Wilderness Institutes, universities, U.S. Soil Conservation Service, State Game and Fish Departments, National Park Services, and other professional instructors.

(b) Outdoor education leadership workshops under sponsorship of universities, for credit hours, open to college level teachers of the general public.

(c) Training of national guard units within the State of New Mexico for firearms training, and maneuver areas.

(d) Archeological and historic tours, reenactments, and participation, with special emphasis on history of the Santa Fe Trail, and primitive skills.

(e) Law enforcement training by colleges, and other professional organizations such as the Federal Bureau of Investigation.

(f) Group training sessions for law enforcement organizations, including the New Mexico State Police, area police, and the New Mexico State Game and Fish Department.

(g) Approved metallic silhouette shoots and trainings, and competition training for black powder shoots, all open to the public.

(h) Miscellaneous other educational purposes.

*NRA*, 92 N.M. at 543–44, 591 P.2d at 674–75. The *NRA* trial court determined that these uses were substantial and primary, and it granted the Fund an exemption. *Id.* at 543, 591 P.2d at 674.

{15} Our opinion in *NRA* did not analyze the particular uses of the property. We were primarily concerned with the Fund's lobbying activities and the fact that a large portion of acreage was mostly idle. *Id.* at 549–51, 591 P.2d at 680–82. We held that " 'promotion, propaganda and lobbying activities [to influence legislation were] definitely not educational.' " *Id.* at 550, 591 P.2d at 681 (quoting *Hazen v. Nat'l Rifle Ass'n of Am.*, 101 F.2d 432, 436 (D.C.Cir.1938)). We then said that proof of even casual engagement in such activities would taint the Fund's educational activities to such an extent the Fund would "lose[ ] its standing as an educational organization whose property is 'used for educational purposes.' " *Id.* at 550, 591 P.2d at 681.

{16} In regard to the land for which the Fund sought an exemption, we stated that the Fund's stated purposes were not determinative, and its "claim that the land was acquired for educational use in the future [did] not assist [the Fund] in establishing an exemption." *Id.* at 549, 591 P.2d at 680. That "a large portion of [the] land [was] idle, unimproved, and unused for any immediate or future purpose" presented a "special problem" which the Court addressed by declaring that a *pro tanto* or partial exemption might be available with respect to that portion of the land used for educational purposes. *Id.* at 550, 591 P.2d at 681.

{17} We remanded *NRA* to the trial court to take further evidence and reconsider the issue of entitlement to an exemption. *Id.* at 551, 591 P.2d at 682. We broadly held "that under the definition stated in this opinion, [the Fund] has not met its burden in proving that the property [it] seek[s] to have exempt from taxation is property that is 'used for educational purposes.' " *Id.* at 550, 591 P.2d at 681. The basis for the remand related primarily to the issues of lobbying and the amount of land not immediately and directly used for educational activities, together with a concern that the trial court may have erroneously considered the Fund's § 501(c)(3) status and relied on the Fund's stated purposes. *Id.* at 549, 591 P.2d at 680.

**The Board's Decision**

{18} In the present case, the Board framed the issue before it as "whether a substantial use, and the primary use, of the subject property is charitable or educational, or a combination of charitable and educational." Using *NRA* as its guide, the Board found and concluded that the direct, immediate, and primary use of the museum property was the operation of a museum for which an entry fee is usually charged and the operation of a retail gift shop. Considering the whole record, the Board concluded that the educational uses of the museum property were not substantial and primary, as required by the *NRA* standard.

{19} In support of its determination, the Board found that only a minority of the educational programs sponsored and operated by O'Keeffe occurred on the museum property, and that, while educational functions occurred there, they were "not the primary use of the subject property." The Board also determined that since educational programs often took place at O'Keeffe's Grant Avenue offices, as well as schools and other locations throughout the state, the museum property was not the primary site for these educational activities.

{20} In the same vein, the Board determined that although the majority of over 600,000 museum visitors since 1997 paid an entrance fee, the persons who benefitted

from educational programs and activities of O'Keeffe, "wherever they may have occurred, numbered in the thousands." In the context of the use of admission fees for educational activities, the Board reiterated that "[a] substantial percentage of these educational activities take place either at the Grant [Avenue] offices ... or at other locations," and that "[o]f the money [O'Keeffe] donates to other institutions, the Board has no way to determine whether these institutions themselves qualify for exemption under Article VIII, [Section] 3, or whether the donations can be traced to insure their use in qualifying ways."

{21} The Board set out several questions it had without answer in the record. Further, the Board was unable from the evidence before it to find substantial evidence or even "any reasonable process from which it might formulate some *pro tanto* exemption with respect to the subject property, were it inclined to do so," because it was shown no allocation of uses of the museum property "between charitable and non-charitable, [or] educational and non-educational." The Board determined that O'Keeffe's § 501(c)(3) status was "immaterial as a matter of law." Nowhere in its decision did the Board mention the *NRA* requirement that the use of the property "embrace[ ] systematic instruction in any and all branches of learning." *Id.* at 548, 591 P.2d at 679. Nor did the Board make any finding with respect to the *NRA* requirement that a substantial public benefit be derived from that instruction.

{22} In sum, the Board determined that O'Keeffe failed to produce sufficient, competent evidence that the primary and substantial use of the property was for educational purposes. In doing so, it either ignored the issue of a museum's intrinsic value, or else in essence attributed negligible intrinsic educational value to the museum itself, and it determined that the active teaching-learning activities at the museum property were insufficient to qualify under the *NRA* primary and substantial test. In the Board's view, the primary and substantial uses were not "educational," but were the collection of fees and retail sales to fund the mostly non-education-

al on-site uses and irrelevant off-site educational programs and activities.

## O'Keeffe's Protest Appeal and Refund Action

{23} O'Keeffe appealed to the district court pursuant to NMSA 1978, § 39–3–1.1 (1999), asserting the Board's decision was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and otherwise not supported by law. Almost simultaneously with its appeal to the district court, O'Keeffe filed an action in the district court pursuant to NMSA 1978, § 7–38–40(A) (1982) for a refund of the taxes O'Keeffe felt compelled to pay in order to prevent the accrual of interest and penalties it would have to pay if it were unsuccessful in its protest appeal. The protest appeal and the refund action were then consolidated.

{24} The district court first resolved the protest appeal. Using *NRA* for guidance, the district court held that the Board's decision was supported by substantial evidence and in accordance with law, and was not fraudulent, arbitrary, or capricious. The court affirmed the Board's decision denying the exemption. The court then entertained cross-motions for summary judgment in the refund action and dismissed that action because O'Keeffe's election of the protest remedy precluded it from pursuing the refund action under NMSA 1978, § 7–38–21(B) (2001).

## O'Keeffe's Appeals to This Court

{25} O'Keeffe appealed the refund action dismissal pursuant to Section 7–38–40(C). With regard to its appeal from the district court's affirmance in the protest appeal, because review of the district court's decision is by writ of certiorari, *see* § 39–3–1.1(E) and Rule 1–074 NMRA 2002, O'Keeffe asks this Court to treat its docketing statement also as a petition for writ of certiorari and to enlarge the time for filing so the petition is deemed timely filed. The County does not object. We treat O'Keeffe's docketing statement as a petition for writ of certiorari, and we accept the petition as timely.[1]

1. The district court's amended final order and judgment was entered on March 22, 2001.

{26} The County asserts in regard to the Board's decision in the protest that this Court's review of the administrative decision, appealed to the district court, is limited under Rule 12–505(D)(5) NMRA 2002. *See C.F.T. Dev., LLC v. Bd. of County Comm'rs*, 2001–NMCA–069, ¶¶ 8–11, 130 N.M. 775, 32 P.3d 784. The County, therefore, asks this Court to deny or quash O'Keeffe's petition for writ of certiorari on the ground no issue exists under Rule 12–505(D)(5) to invoke review. O'Keeffe asserts that the district court misconstrued the law.

■ {27} We agree with O'Keeffe that the issue is both significant under the New Mexico Constitution and of substantial public interest, thus bringing this case within our certiorari jurisdiction. The issues require us to analyze the *NRA* standard and its application to the facts in this case and to consider whether to further refine the standard or develop an exception to it. We proceed with certiorari review for these reasons. *See C.F.T.*, 2001–NMCA–069, ¶ 8, 130 N.M. 775, 32 P.3d 784. We interpret the Constitution and determine whether the law was properly applied to the facts through de novo review. *See State ex rel. Pub. Employees Ret. Ass'n v. Longacre*, 2001–NMCA–076, ¶ 9, 131 N.M. 156, 33 P.3d 906.

{28} In this Court, O'Keeffe argues Board error because it ignored the fact that the Assessor's determination that O'Keeffe was not entitled to an exemption was legally deficient, arbitrary, and capricious; ignored the overwhelming evidence of O'Keeffe's educational mission and pursuits; failed to consider O'Keeffe's donations of fees to state museums to be for charitable or educational purposes; was institutionally incapable of evaluating and failed to consider the intrinsically and inherently educational nature of a museum; and based its denial of the exemption on the grounds that O'Keeffe's charging of admission fees and generating sales in its gift shop constituted the direct, primary, and substantial use of the museum property.

O'Keeffe filed its appeal on March 23, 2001, which was one day after entry of the final judgment. The notice of appeal was therefore filed within the twenty-day time limit imposed by Rule 12–505(C) NMRA 2002 for seeking review on certiorari. *See W. Gun Club Neighborhood Ass'n*

{29} O'Keeffe contends the district court's errors "essentially paralleled the Board's errors." In addition, O'Keeffe asserts that the court failed to interpret the evidence in light of the standards of review in Section 39–3–1.1(D). O'Keeffe also contends that the district court erroneously dismissed its refund action. We address these contentions below in three points: (1) the Assessor's denial of the exemption, (2) the application of *NRA* and the purpose of the exemption, and (3) O'Keeffe's procedural protest-refund action dilemma.

## DISCUSSION

### I. The Assessor's Denial of the Exemption

{30} O'Keeffe contends the Assessor arbitrarily denied the application because he relied solely on an outside view of the property, without visiting the interior of the museum and talking to museum personnel about its educational programs. Thus, O'Keeffe argues, because the Assessor's denial of the exemption was based on a deficient, superficial, perfunctory, and result-oriented investigation, it was arbitrary and capricious and the exemption denial by the Assessor and the Board should therefore be set aside.

■ {31} We review this issue because it raises a significant question as to whether a valuation protests board can deny an exemption in a protest proceeding if an assessor's exemption denial is not rationally based. Our review is de novo because the question is one of law. *See, e.g., Cooper v. Chevron U.S.A., Inc.*, 2002–NMSC–020, ¶ 5, 132 N.M. 382, 49 P.3d 61.

{32} Property is presumed to be subject to taxation. *See* 3.6.7.16.A NMAC (2002). It is the taxpayer's burden to claim, apply for, and prove an exemption based on an educational or charitable use. *See* NMSA 1978, §§ 7–38–8.1 (1982), 7–38–17(B), (E) (2000); 3.6.7.16.C NMAC (2002); *United Veterans Org. v. N.M. v. Extraterritorial Land Use Auth.*, 2001–NMCA–013, ¶ 3, 130 N.M. 195, 22 P.3d 220 (electing to treat the notice of appeal that was filed within twenty days after the final action of the district court as a petition for writ of certiorari).

*Prop. Appraisal Dep't,* 84 N.M. 114, 118, 500 P.2d 199, 203 (Ct.App.1972). The statutes do not require any specific investigation by an assessor when considering tax application for an exemption.

{33} The record is unclear as to what O'Keeffe presented to the Assessor, though at a minimum its application for an exemption contained a one-page claim form on which O'Keeffe referred to an exhibit for the educational and charitable activities that O'Keeffe claimed were the primary use of the property. The record does not reflect of what the exhibit consisted. O'Keeffe fails to show how it carried its burden at the initial evaluation stage.

{34} More importantly, O'Keeffe fails to point out how the failure of the Assessor to conduct an on-site inspection with interviews invalidates the Board's decision which followed a full evidentiary protest hearing. The place to overcome an assessor's arbitrary denial is in an administrative protest proceeding or refund action. O'Keeffe filed a protest and was permitted to present evidence to prove the Assessor wrong. The Board considered all of the evidence presented by O'Keeffe. *See In re Miller,* 88 N.M. 492, 497, 542 P.2d 1182, 1187 (Ct.App.1975), *rev'd on other grounds,* 89 N.M. 547, 555 P.2d 142 (1976). While it might be good practice for an assessor to perform a field investigation involving a tour of the property and to visit with related personnel about education and charitable programs conducted at the property, the failure of an assessor to do so does not invalidate the decision of a valuation protests board after a protest hearing.

## II. The Applicability of *NRA* and the Purpose of the Exemption

{35} The Board limited its examination of the requirements for an exemption to those of direct, primary, and substantial use of the property, for it was solely on these requirements that the Board denied the exemption. Central to O'Keeffe's contention that the Board erred are its assertions that the Board failed to address the "fundamental question of whether a museum is intrinsically or inherently 'educational' by virtue of providing citizens with a profound means for encountering, and being moved by, artistic expression at its highest level of achievement," and failed to recognize the museum as the focal point for its extensive off-site educational programs and activities. O'Keeffe accuses the Board of improperly combining randomly selected language from *NRA* and construing *NRA* too narrowly.

{36} The Board nowhere discusses any aspect of the *NRA* requirement that the use embrace "systematic instruction in any and all branches of learning from which a substantial public benefit is derived." *Id.* at 548, 591 P.2d at 679. Recognizing that "there are several points not fully explored by the Board or District Court," the County argues that the lack of " 'systematic instruction' in any and all branches of learning from which substantial public benefit is derived" also warrants denial of the exemption. The essence of this argument is that O'Keeffe did not show its programs were " 'systematic' or developed pursuant to some sort of organized, comprehensive method, as opposed to their being independent programs developed according to isolated perceived needs."

{37} We preface our discussion of the issue before us with a brief discussion of policies we must consider alongside the requirements for an exemption. The exemption O'Keeffe seeks is of constitutional origin. As such, it is a privilege that this Court is obliged to carefully protect. Because the exemption is so broadly stated and must be limited by court interpretation, we have the daunting tasks of attempting to construe the exemption provision, of balancing its purpose with the importance of property taxation, and of considering a practical and common sense approach to application of the exemption to the circumstances before us.

### A. Policies to Consider

{38} Subject to specific exceptions, all property with a taxable situs in New Mexico is subject to valuation for property tax purposes. NMSA 1978, § 7–36–7(A) (1973, as amended through 2001). One class of exceptions is property that is exempt from taxation under the New Mexico Constitution.

*See* § 7–36–7(B)(1). Property exempt from taxation under Article VIII, Section 3, is not subject to valuation for property taxation purposes. *See id.*

### 1. Taxation and Exemption

{39} We must bear in mind the importance of property taxation to our local governments.

> We note also that the necessary expenses of government are becoming greater and the necessity for better utilization of the existent property tax is urgent. Tax exemption has a direct effect on the size of the tax base. The scope of tax exemption has broadened so that exempt organizations tend to grow wealthier and often increase the percentage of exempt property within the state first granting the exemption. Such increased exemptions may create a serious problem because a diminished tax base lessens the amount available to meet governmental costs. This factor also requires an organization that seeks a tax exemption to give the public a "substantial public benefit."

*NRA*, 92 N.M. at 548, 591 P.2d at 679. Further, as *NRA* states, the rationale for the constitutional mandate that:

> "taxes shall be equal and uniform upon subjects of taxation of the same class[,]" ... is that all property should bear its share of the cost of government. Property which is exempt from taxation does not share in the burden. Therefore, in exchange for its exempt status, such proper-

ty must confer a substantial substantial benefit on the public.

*Id.* (quoting N.M. Const. art. VIII, § 1).

### 2. Property

 {40} We must also bear in mind that it is the taxation of real property, not the taxation of income or receipts or other subjects of taxation, with which we are concerned. It is therefore the use of the property, not the ownership, that is the determinative factor in property taxation. *Mountain View Homes, Inc. v. State Tax Comm'n,* 77 N.M. 649, 652, 427 P.2d 13, 15 (1967). The declared objects and purposes of the owner are not determinative. *United Veterans Org.,* 84 N.M. at 115, 500 P.2d at 200. Furthermore, in the context of the educational and charitable purpose exemptions, Article VIII, Section 3 appears to make no distinction between private nonprofit and for-profit entities. In Section 3, the phrase "all property used for educational or charitable purposes" is not limited, as are other phrases, by the words "not used for commercial purposes" or by the words "not used or held for private or corporate profit." Also, at least until 2001,[2] a § 501(c)(3) status under the Internal Revenue Code was immaterial. *See NRA,* 92 N.M. at 549, 591 P.2d at 680. The determination whether to grant an exemption is not to be made on "the remote and consequential benefit derived from [the property's] use." *Id.* at 546, 591 P.2d at 677.

### 3. Interpretation

{41} The words "used for educational purposes" are very broad and are not defined in

---

**2.** In 2001 the Legislature enacted an amendment to Section 7–36–7, which states that property exempt from property taxation:

> includes property of a museum that: 1) has been granted exemption from the federal income tax by the United States commissioner of internal revenue as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended or renumbered; 2) is used to provide educational services; and 3) grants free admission to each student who attends a public school in the county in which the museum is located[.]

§ 7–36–7(B)(1)(c). The County footnotes its view that this subsection is unconstitutional as applied to real property because Article VIII,

Section 3 grants legislative authority to exempt only personal property from taxation. *Cf. State ex rel. Attorney Gen. v. State Tax Comm'n,* 40 N.M. 299, 301, 58 P.2d 1204, 1206 (1936) ("By the terms of section 3 of article 8, certain specific property is exempt from taxation, and by section 5 thereof the Legislature is authorized to exempt from taxation certain other specific property; and no other property is or can be exempted. The Constitution, in effect, classes tangible property into that exempt from taxation, that which may be exempted, and that which must be taxed."). We do not in this opinion intend to suggest how we might view or interpret this statute.

our state Constitution. As the County reminds us, virtually any aspect of the human experience can be considered educational.

The broad expression "used for educational or charitable purposes" necessarily imposes upon the courts a severe task of interpretation. It is easy to instance purposes clearly within it. It is not difficult to suggest instances which would reduce to absurdity a rule too liberal. Appellees point out that the ordinary home is customarily used for educational purposes and often for charitable purposes. In a broad sense, a golf professional, a riding master, or a boxing instructor, is engaged in education. Charity may "cover a multitude of sins." The line of demarcation cannot be projected. It can take shape only by the gradual process of adjudicating this or that purpose or use on the one side of it or on the other, or by change in the constitutional criteria.

*Temple Lodge No. 6, A.F. & A.M. v. Tierney,* 37 N.M. 178, 187, 20 P.2d 280, 284–85 (1933).

■ {42} The New Mexico Constitution drafters' use of the words "educational or charitable purposes" left for the courts the duty to interpret with no "line of demarcation." *Mountain View Homes,* 77 N.M. at 651–52, 427 P.2d at 15. "[N]o case can be said to constitute a controlling precedent for another case" except where the facts regarding use "are so nearly alike as to logically compel like results." *Benevolent & Protective Order of Elks, Lodge No. 461 v. N.M. Prop. Appraisal Dep't,* 83 N.M. 445, 446, 493 P.2d 411, 412 (1972).

■ {43} In *Mountain View Homes,* the Court required for interpretation of "charity" and "charitable use" a determination of how those "terms were understood by the membership of our constitutional convention, and by the ordinary voter who participated in adoption of the constitution containing this language[.]" *Id.* at 653, 427 P.2d at 16 (holding that property used to operate a quasi-public low-rent housing project would not have been considered charitable when the Constitution was adopted). That said, there exist instances in which the broad language of the state Constitution may be adapted to changed times and conditions. *See In re*

*Generic Investigation into Cable Television Servs.,* 103 N.M. 345, 348, 707 P.2d 1155, 1158 (1985) (stating that words in the state Constitution "are not necessarily fixed in meaning, but over the years may change and grow to reflect changes in the conditions and knowledge of modern society"); *Humana of N.M., Inc. v. Bd. of County Comm'rs,* 92 N.M. 34, 36, 582 P.2d 806, 808 (1978) (same); *cf. Tierney,* 37 N.M. at 187, 20 P.2d at 284 (contrasting the circumstances with "a case where the broad language of a Constitution may be adapted to changed times and conditions"). "Our problem is to ascertain the reasonable and probable intent [of the words]." *Id.* at 185, 20 P.2d at 283. We are to effectuate the probable intent of the words through an interpretation that neither favors nor prejudices the taxpayer or the state. *Benevolent & Protective Order of Elks,* 83 N.M. at 447, 493 P.2d at 413.

■ {44} The rights granted in our constitutional exemption "are not to be frittered away by a construction so strict as to be unreasonable or harsh." *Tierney,* 37 N.M. at 185, 20 P.2d at 283. However, the rights granted "are not to be so enlarged as to create rights which the Constitution makers did not contemplate." *Id.* We should apply a common sense construction rooted in the view that property used primarily and substantially for charitable or educational purposes in a manner that benefits the public is exempt. *See id.* at 188, 20 P.2d at 285.

{45} The words "used for educational purposes" are defined in *NRA* as "the direct immediate, primary and substantial use of property that embraces systematic instruction in any and all branches of learning from which a substantial public benefit is derived." *Id.* at 548, 591 P.2d at 679. Reading *NRA* too broadly can give New Mexico's thirty-three valuation protests boards, each of which may change each election cycle, little guidance in deciding whether to grant an exemption. Too broad a standard means no standard. Without a relatively narrow standard governing the educational purposes exemption, subjective ad hoc decision-making can become the rule, making an objective principled process the exception. It is apparent that the *NRA* Court sought to narrow

the meaning of the constitutional language and to provide guidance to assessors and valuation protests boards. To indiscriminately broaden *NRA* as expansively as O'Keeffe suggests will, in our view, open a door for standardless property tax exemption determinations.

{46} Yet, for us now to read *NRA* to allow an exemption only for a formal, structured, teacher-student instructional school environment would be too restrictive a reading of *NRA*. Application of too narrow a standard can easily defeat the obvious purpose of the exemption, which is to encourage private citizens to engage in educational pursuits from which the public derives a substantial benefit. To adhere to *NRA* as narrowly as the County suggests in order to defeat an exemption, with respect to a private museum that provides a substantial educational benefit to the community, is too restrictive, as we discuss below.

{47} In the present case, O'Keeffe, a private corporation, engages in educational pursuits from which different segments of the public derive a substantial benefit. We turn to the question whether the *NRA* standard as applied by the Board and the district court of direct, primary, and substantial use defeats the purpose of the constitutional exemption in the unique setting of O'Keeffe's museum and its related educational programs and activities.

**B. A Museum May Constitute a Use for Educational Purposes**

{48} With the foregoing policy concerns in mind, we conclude that, while the Board did not err in respect to O'Keeffe's failure of evidence under the *NRA* standard as it was applied by the Board, the concept of a private museum as a tax-exempt property under the educational-use exemption should be viewed and evaluated through a somewhat different approach from that in *NRA*.

{49} The traditional museum is an entity that collects and houses for posterity a permanent collection of notable items of public interest and presents those as well as perhaps other items of public interest to the general public for their education and en-

lightenment. A museum, according to *Webster's II New College Dictionary* 722 (1995), is "[a]n institution for the acquisition, preservation, study, and exhibition of works of artistic, historical, or scientific value." The Encyclopaedia Britannica's description of an art museum is apropos:

> The public art gallery is a creation of the nineteenth century. Unconsciously, it is an assertion of the collecting instinct of the community; consciously, it has been designed to instruct the public, to educate artists, to encourage contemporary art by purchase, and to provide material for historical research.

15 *Encyclopaedia Britannica*, Museums and Art Galleries, at 994 (1947).

{50} Traditional museums collect or reproduce and exhibit aspects and parcels of our history such as, for example, the creatures, flora, and geologic formations that comprise our natural history; our scientific discoveries and technological innovations; and our cultures. Such collected, preserved, and exhibited phenomena have intrinsic educational value. Through the museum setting, the public is given a window through which to view both past and present. We are able to learn for the very first time or to confirm aspects of our lives, of our nature, of our manner of living, of earth, and of outer space, and to learn of their evolutions. Museums give us permanent collections of notable subjects for our own discovery and understanding. Those who have walked through the great museums of science and technology, natural history, and art in this country and around the world know the educational impact. They know they have received a significant educational experience. The impact is often present even if the recipient does not understand or appreciate its effect.

{51} The Encyclopaedia Britannica discusses the growth of art museums in the United States, stating, among other things, that "art museums are performing the very important task of revitalizing the art of the past and integrating it into the lives of the citizens." *Id.* at 996. Their obligation is to the public, *see id.* at 996–97, and they offer various important services to the public. *Id.* at 1000.

{52} Of course, how effective the museum is depends in large part on both its subject matter and its funding. Public museums can falter due to lack of adequate funding. No reason exists why an adequately funded private museum cannot, and will not, serve the public as well as an adequately funded public museum. Museums, whether private or public, must integrate themselves into the community and have subjects of public interest in order to survive. If non-profit, or government-owned, they depend primarily on donations (including grants and legislative funding), admission fees, and retail sales in gift shops.

{53} A museum, at least so called, that collects and exhibits few items, items of inferior brand, or items of little historical or educational interest or value, and that attracts few visitors from or interest on the part of the general public, may be viewed as having little, rather than substantial public benefit. Some such "museums" might exist as a ruse in order to attempt to obtain a property tax exemption. A "museum" of art may be established with an owner's own artwork but lack any useful public education component. Some private, for-profit art gallery entrepreneurs might attempt to devote a portion of a commercial property for "museum" use in order to obtain a *pro tanto* tax exemption, when the "museum" is primarily used to draw customers for sales. These so called "museums," and others established under similar schemes, may not pass the primary and substantial test for exemption.

{54} There can be little question, however, that properties devoted primarily and substantially to traditional museum functions of: (1) the preservation and exhibition of significant aspects, artifacts, and works of our lives and history for the benefit of the general public's appreciation, study, and knowledge; and (2) the carrying on of museum-related educational programs and activities such as lectures, studies, libraries, research facilities, publishing scholarly material, and creating instructional materials for teachers and school children, are properties with uses and purposes that ought to be considered for educational purposes exemption under Article VIII, Section 3 of our Constitution.

{55} That, in addition to showing its permanent or other collections, a museum property is used for more direct or active on-site instructional educational programs adds dimension to the property's educational use. In addition, a natural extension of public service is for a museum to serve as the nexus and focal point for off-site educational programs and activities closely related to the purpose and collections of the museum. Museums can, and should, reach out to teachers and their students to assist in providing early and ongoing educational experiences. Museums can, and should, reach out to segments of our society that may not, for economic or other reasons, seek out the opportunity to experience what the museum has to offer. This outreach constitutes the limbs of the museum body, complementing in a direct and beneficial way the educational opportunities existing on the museum property itself—acting as arms and hands to gather particular segments of the public into the experience the museum has to offer, and acting as legs and feet to deliver that experience. Furthermore, that a museum property is used to raise funds for the museum's operation and for its related outreach through programs and activities that occur in schools or in off-site training programs or lectures should not detract or be separated from its educational use and purpose.

{56} It is unwise to invoke an immutable, complete separation between the actual use of a museum property and the closely related functions of the institution (here, O'Keeffe) that owns and makes use of the property. While such a separation may make sense in most circumstances, the unique circumstance of a genuine museum that serves as the anchor for and lifeblood of extensive museum-related educational programs and activities carried on by the museum off the museum property is, in our view, a circumstance calling out for a slightly different view than that of the Board and the district court. We think that such a unique circumstance requires a slight departure from the full *NRA* standard otherwise applicable, permitting consideration of whatever

intrinsic educational value a museum has to the museum visitors and of off-site educational programs and activities closely related to and inextricably interconnected with the museum collection.

{57} Any such departure, however, may not avoid the requirement that a museum must adhere to a systematic approach to learning. This requires an ordered, methodical, structured, and regular learning opportunity provided by a museum owner whose primary goal and major purpose through its museum is to impart knowledge and information in order to educate the public in respect to what *NRA* calls a "branch of learning." And it requires substantial public benefit.

{58} In regard to a museum, the "branch" cannot, of course, be simply a twig so discrete as to educate or inform only a very small or very particularized citizenry. For a museum, the substantial public benefit must be derived from substantial numbers of the general public participating in the museum's visitation opportunities and taking in the museum's programs and activities, including particular segments of the public engaging in any direct outreach opportunities closely related to the museum and for which the museum is the nexus and focal point.

{59} The relationship between the off-site education programs and activities must be so closely interconnected with the museum collection that were the collection to disappear, the programs and activities would lose their essential subject and purpose, namely, the museum collection as their focal point for learning. A further essential ingredient of the interconnection is, when practicable, on-site museum visits.

{60} It appears obvious that O'Keeffe's museum property is not meant to be used, and is not actually used, only as a gallery of Georgia O'Keeffe art serving little other purpose than simply to preserve her name as tied to her art. O'Keeffe presented evidence to show that Georgia O'Keeffe's life and art were not only a significant aspect of New Mexico's general and art history, but also a contribution to American art and art history. O'Keeffe has exhibited the artwork of contemporaries of Georgia O'Keeffe, and has

shown that the museum opens the on-site doors to awaken tens of thousands of visitors, including thousands of children each year, to the world of fine art, art history, and a delightful aspect of New Mexico history. In addition, O'Keeffe provides opportunities for several segments of the New Mexico public to derive important tangible and intangible educational experiences.

{61} There is no way to know whether the drafters of the state Constitution and the voters at that time had in mind private museums, much less private art museums. We do know that the drafters chose the broad wording of "educational purposes" instead of continuing a much more limited exemption contained in territorial law. *See Tierney*, 37 N.M. at 184, 20 P.2d at 283. It is entirely within the spirit and purpose of the constitutional provision, and in accordance with our present-day notions of the educational value of many museums we have encountered, to bring museum properties within the reach of exemption from taxation.

{62} We recognize that a museum with on-site and intrinsic educational value and closely related on- or off-site programs and activities can be the type of property with a use that "embraces systematic instruction ... from which a substantial public benefit is derived" as contemplated under the *NRA* standard. *Id.* at 548, 591 P.2d at 679. Because the Board did not consider the unique circumstances of a museum, we remand this case to district court for a further hearing before the Board, permitting further evidence, particularly on the issues of the extent of any intrinsic educational value the museum provides and of the relationship of O'Keeffe's off-site programs and activities to the museum. The Board is to then determine the exemption issue in conformity with this opinion.

{63} Further evidence, if offered, might bear particularly on the specific, correlative interplay between the museum and the off-site programs and activities; the extent, if any, the off-site programs and activities are dependent on and derived from the museum collection; in what manner the programs and activities are educational; the intrinsic edu-

cational value of the museum, if any, giving a rational basis and substance to the view of intrinsic educational value, and proving that the function of the museum is considerably greater than sheer entertainment; how, if at all, the appreciation of fine art and of art expression can measurably benefit our emotional well-being and measurably enhance our knowledge and intellectual growth; and the significance of the fact that educational institutions offer formal studies in art appreciation, art history, art therapy, and how to draw and paint, plus the educational value, if any, derivable from those subjects. It would also seem useful to provide the details of O'Keeffe's expenditures to show how much of its operating budget is dedicated to educational pursuits specifically related to the museum and to programs and activities that are both educational and closely tied to the museum. If learning is inherent in the traditional museum setting of exhibiting art and is also derived from on- and off-site programs and activities dependent on and derived directly from the museum, if the learning opportunities are ordered, methodical, structured, and regular, and if substantial portions of the public derive a substantial benefit from all of this, O'Keeffe should be able to articulate that for the Board. In evaluating the substantial benefit to the public, O'Keeffe must show that the museum's educational component, that is, its educational benefit to the public, must be worth the public's grant of tax exempt status.

{64} In the last analysis, an equation must exist showing the museum's educational component, that is, the educational benefit to the public, to be worth the public's grant of tax exempt status.

### C. O'Keeffe's Donation of Money to the State

{65} The Board was unpersuaded that the funds donated to state museums were "being employed in charitable or educational purposes." The Board's reasoning was that O'Keeffe produced insufficient evidence for the Board to know "whether these donees themselves qualify for the ... exemption, or whether the donated proceeds are used in a manner that would otherwise qualify." For

example, the Board asked, "Do the donee museums own multiple properties, some qualifying for property tax exemption, others not?" And, "Can the use of the donated money be traced in such a way as to insure that it is used in a qualifying manner?" Also, "Is some percentage of the money used in a qualifying manner?" Without proof of how the donated funds were actually used, the Board would not consider whether the use was for a charitable or an educational purpose.

{66} As to the actual use of the donated funds, the record bears the Board out. An O'Keeffe witness testified that "donations to the Museum of Fine Arts ... [were] restricted to educational, exhibition and acquisition purposes, and the donations to the Museum of New Mexico [were] unrestricted." O'Keeffe's proof was of the fact of donation. The proof was not sufficient to show the use of the funds for particular purposes.

{67} In this opinion, we have considered whether a museum property may be entitled to an educational purposes exemption. We have not considered whether such a museum property may be entitled to a charitable purposes exemption. O'Keeffe's donation of funds to state museums hardly qualifies the museum property for a charitable purposes exemption. The donations might, in the larger picture of the educational purposes exemption, assist in proving substantial public benefit. To the extent O'Keeffe can show that the donated funds were actually used for educational purposes, the evidence should assist it in its attempt to obtain an educational purposes exemption under the guidelines set by us today in this opinion.

### III. O'Keeffe's Procedural Protest–Refund Action Dilemma

**Standard of Review**

{68} The issue is whether O'Keeffe can obtain a refund under NMSA 1978, § 7–38–21(A)(2) (1983, amended through 2001), if it prevails in the Board protest proceeding. The district court granted summary judgment dismissing the refund action. *See* Rule 1–056(C) NMRA 2002. We are asked to interpret provisions of the Prop-

erty Tax Code, which requires de novo review. *See Morgan Keegan Mortgage Co. v. Candelaria*, 1998–NMCA–008, ¶ 5, 124 N.M. 405, 951 P.2d 1066.

{69} If a taxpayer files a protest, interest and any penalty on the taxes due continue to accrue through the period of the protest proceeding and during any appeal of the valuation protests board's determination. *See* NMSA 1978, § 7–38–49 (1973) (requiring the taxing authority to impose interest during the pendency of an appeal). O'Keeffe filed a protest, but also paid the 1999 taxes while the protest was pending in order to halt the accrual of interest and penalties. O'Keeffe asserted below that the Property Tax Code election of remedy provision in Section 7–38–21 creates a "procedural conundrum," and placed O'Keeffe in "an insoluble Catch–22." O'Keeffe contended below that if it prevailed in the Board protest, it should be entitled to a refund of the taxes paid. In order to obtain a refund, however, O'Keeffe under the present statutory scheme had to file a refund action within sixty days of the denial of the exemption. The district court nevertheless dismissed the refund action, because "[h]aving filed a petition of protest with the county assessor as provided in the Property Tax Code, [O'Keeffe] has unconditionally and irrevocably waived any right to pursue a claim for tax refund."

{70} O'Keeffe argues that it should be permitted to pay the taxes to stop the accrual of interest and penalty while a protest proceeding is pending and if it wins the protest on appeal should be able to obtain a refund of the taxes it paid. Thus, O'Keeffe asserts the district court erred in dismissing the refund action and that the court should have used the refund action to grant a refund of the taxes paid if O'Keeffe ultimately prevailed in the Board protest appeal.

{71} Under New Mexico law, a taxpayer must elect its remedy under Section 7–38–21(A), (B):

A. A property owner may protest the value or classification determined for his property for property taxation purposes, the allocation of value of his property to a particular governmental unit or a denial of a claim for an exemption or for a limitation on increase in value either by:

(1) filing a petition of protest with the director or the county assessor as provided in the Property Tax Code [Chapter 7, Articles 35 to 38 NMSA 1978]; or

(2) filing a claim for refund after paying his taxes as provided in the Property Tax Code.

B. The initiation of a protest under Paragraph (1) of Subsection A of this section is an election to pursue that remedy and is an unconditional and irrevocable waiver of the right to pursue the remedy provided under Paragraph (2) of Subsection A of this section.

Thus, the taxpayer is required to make a choice at the outset, when the assessor denies an application for an exemption. The taxpayer either files a protest, or pays the tax and files a refund action. *See* § 7–38–21(A); 3.6.7.30 NMAC (2002).

{72} The County therefore argues that O'Keeffe created its own procedural conundrum and Catch–22, a circumstance that has arisen only because O'Keeffe ignored Section 7–38–21(A). The County essentially argues that O'Keeffe chose the path of testing the statute by filing both a protest and a refund action, thereby creating its own problem. O'Keeffe, saying the County misses the point, asserts that the Property Tax Code fails to "establish refund procedures or forbearance provisions in the context of a Board appeal." Because the Code is silent on this, O'Keeffe argues, a taxpayer who pays the taxes to hedge against having to pay interest and penalty but who does not file a refund action has no way of knowing if it can obtain a refund of the taxes paid if it ultimately prevails in the appeal. O'Keeffe insists that due to this uncertainty it "was constrained" to file a refund action and to do so within the sixty day period. O'Keefe sums up:

The point is not that the statutes provide for an election of remedies between a Board appeal and a refund action. Rather, the election of one remedy (a Board appeal) should not place the exempt institution in a double-bind position where it cannot reasonably assess how the County will proceed or whether the Board has the

authority (or the willingness) to order a refund of taxes paid under protest if more than sixty days has passed since payment.

{73} O'Keeffe points to *Lovelace Ctr. for Health Sciences v. Beach*, 93 N.M. 793, 606 P.2d 203 (Ct.App.1980), to show that, with respect to constitutionally exempt property, where no statutory refund procedure exists, the district court has authority to "order the refund of the taxes paid on erroneously assessed property if the taxes were paid involuntarily." *Id.* at 797, 606 P.2d at 207. We held that "property taxes paid by [the taxpayer] were based on erroneous assessments because the property was constitutionally exempt from taxation," and that "[a] district court may order the refund of the taxes paid on an erroneously assessed property if the taxes were paid involuntarily." *Id.* We vacated the district court order denying a refund, and remanded for a determination whether the taxes were involuntarily paid. *Id.*

{74} O'Keeffe's contention has an air of sensibleness to it, in that if a taxpayer pays the tax during a protest of a board's denial of constitutional tax exempt status, or during an appeal from that denial, it seems reasonable that if the taxpayer is successful, the payment should be refunded. We can also see that, based on the uncertainty indicated by the existence of the issue before us, filing a refund action, as here, might be a careful move to attempt to rebut a contention that no refund would be available under any circumstance because the taxpayer failed to indicate through a refund action that the payment was conditioned upon a refund if the taxpayer prevailed on appeal. There exists no indication in the record whether the government has a process by which paid taxes can be refunded outside of a refund action under Section 7–38–21.

{75} These are issues that require adjudication separate from the issue of entitlement to an exemption and only after an erroneously denied exemption is reversed and the exemption is granted. We choose not to reach in this appeal the issue whether O'Keeffe may obtain refund relief by means other than Section 7–38–21 if it prevails and obtains exempt status for the year 1999.

{76} Presently we are bound by the statutory procedure in Section 7–38–21. *See Beach*, 93 N.M. at 796, 606 P.2d at 206 ("If a statutory procedure exists either for recovery of taxes collected erroneously or for disputing an excessive assessment, that procedure must be followed."). We hold the district court did not err in dismissing O'Keeffe's Section 7–38–21 refund action.

**CONCLUSION**

{77} We affirm the dismissal of the statutory refund action. On the issue of O'Keeffe's entitlement to an exemption, we reverse the district court and remand to the district court with instructions that it remand to the Board for further proceedings consistent with this opinion.

{78} **IT IS SO ORDERED.**

WE CONCUR: CELIA FOY CASTILLO and IRA ROBINSON, Judges.