2001-NMCA-096

34 P.3d 124

MORIARTY MUNICIPAL SCHOOLS,
Plaintiff–Appellant,

v.

New Mexico PUBLIC SCHOOLS
INSURANCE AUTHORITY,
Defendant–Appellee,

and

Arlene Fischer; Richard N. Fischer; Ronny Fouts, CPA; William A. Olmstead, CPA; Norwest New Mexico, N.A.; The Travelers Indemnity Company of Illinois; Underwriters at Lloyd's, London; Sphere Drake Insurance Co., PLC; and CNA Reinsurance of London, Ltd., Defendants.

No. 20,969.

Court of Appeals of New Mexico.

Aug. 21, 2001.

John W. Boyd, Joseph Goldberg, Freedman Boyd Daniels Hollander Goldberg & Cline, P.A., Albuquerque, NM, for Appellant.

Paul D. Mannick, Coppler & Mannick, P.C., Santa Fe, NM, for Appellee.

## OPINION

SUTIN, Judge.

{1} Moriarty Municipal Schools (Moriarty) appeals the dismissal of its complaint against New Mexico Public Schools Insurance Authority (the Authority). The complaint alleged that the Authority breached a contract by failing to fully indemnify Moriarty for loss from embezzlement. The issue is whether a member school can sue the Authority in contract in district court. We agree with Moriarty that it can and reverse.

## BACKGROUND

{2} A statutory function of the Authority is to provide risk insurance to public schools under the Public School Insurance Authority Act (the Act), NMSA 1978, §§ 22–2–6.1 to –6.10 (1986, as amended through 1999). As a participating school, Moriarty received insurance through the Authority covering embezzlement loss. Insurance policies were issued by private insurance companies. The insurance consists of a layer of self-insured retained coverage for which the Authority is responsible and a layer of excess coverage for which the private insurers issuing the policies are responsible.

{3} Moriarty sought indemnity from the Authority and the private insurers for over $600,000 in embezzlement loss. Based on its determination of covered loss payable by it to Moriarty, the Authority paid Moriarty $250,000. Moriarty and the Authority disagree on the amount of loss covered under the insurance policies. The significant dollar amount of the loss, the long period of time over which the loss occurred (1985 to 1994), and the involvement of several different and overlapping policies, apparently will require a fairly complicated analysis to ultimately determine what amounts the Authority and the private insurers may each be obligated to pay. Moriarty seeks district court adjudication of these obligations in order to avert inadequate or inconsistent determinations that could unfairly limit Moriarty's rightful indemnity recovery. This appeal involves solely Moriarty's claims against the Authority.

{4} Moriarty sued the Authority claiming breaches of contract, the implied covenant of good faith and fair dealing, and fiduciary duty. Moriarty also claimed violations by the Authority of the Insurance Code, NMSA 1978, §§ 59A–16–1 to –30 (1984, as amended through 1999), and the Unfair Practices Act

(UPA), NMSA 1978, §§ 57–12–1 to –16 (1967, as amended through 1999). The Authority moved to dismiss under Rule 1–012(B)(1) and (6) NMRA 2001, asserting several reasons for dismissal. The district court granted the Authority's motion to dismiss without stating a basis for its ruling.

{5} Because this appeal is based on threshold dismissals of Moriarty's claims against the Authority for lack of subject matter jurisdiction under Rule 1–012(B)(1) and failure to state a claim under Rule 1–012(B)(6), we do not address specific policy coverage issues or the specific obligations of the Authority or the private insurers under the policies.

## DISCUSSION

### A. The Public School Insurance Authority Act

{6} The purpose of the Act "is to provide comprehensive core insurance programs for all participating public schools ... by expanding the pool of subscribers to maximize cost containment opportunities for required insurance coverage." Section 22–2–6.2. The Legislature created the Authority "to provide for ... risk-related coverage." Section 22–2–6.4. The Legislature also created a " 'public school insurance fund' " for the Authority "to carry out the provisions of the ... Act." Section 22–2–6.6(A). In order to procure insurance coverage the Authority collects premiums from participating school districts "sufficient to provide the required insurance coverage," deposits the premiums in the insurance fund, and disburses money from the fund. Sections 22–2–6.6(D), (F), –6.7(C), –6.8(A). A school district must participate in the Authority unless the school district's financial status justifies a waiver granted by the Authority's board of directors. Section 22–2–6.9(A). The Authority has the authority to "negotiate new insurance policies covering additional or lesser benefits," and "maintain all coverage levels required by federal and state law for each participating member." Section 22–2–6.7(F). The Authority may "procure lines of insurance coverage" as well as "self-insure a particular line of cover-

age." Section 22–2–6.7(F), (G). The Authority is given the power to "promulgate necessary rules, regulations and procedures for implementation of the ... Act." Section 22–2–6.7(E).

{7} By its regulations, the Authority has the power to negotiate, obtain, and modify basic and excess policies, self-insure, and establish pooling arrangements in order to provide risk-related coverages for "entities authorized to participate in the Authority's Coverage"; establish self-insured retention levels and deductibles; offer risk-related coverages to school districts; and issue a Notice of Coverage for each offering to each participating school district. *See* 6 NMAC 50.3.8, 3.9, 6.8. In this litigation the Authority says it has by regulation defined its statutory duty to distribute money from its retained pool by the language in successive insurance policies it purchased from co-defendants Lloyd's and Travelers [1] on behalf of its members. The Authority chose to conform its retained-pool self-insurance duties to terms of the insurance contracts and to "determine[] and disburse[] benefit limits to Moriarty from the insurance pool."

### B. Overview of Contentions

{8} Moriarty's complaint alleges the Authority provided coverage through contractual insurance documents insuring Moriarty against the risk of the loss in question after having accepted premiums from Moriarty, and that the Authority breached its insurance obligations by failing to indemnify Moriarty in full for covered losses. Stating that its claims sound in contract, Moriarty argues the averments in its complaint are not susceptible to a Rule 1–012(B)(6) defense and that the district court has jurisdiction to entertain a civil action alleging common law breach of contract under N.M. Const. art. VI, §§ 1, 13.

{9} The Authority's first of two primary lines of attack against Moriarty's non-statutory claims is that the claims are barred by sovereign immunity. Being purely a crea-

---

1. These companies are shown in the caption. Lloyd's consists of Underwriters at Lloyd's, London, Sphere Drake Insurance and CNA Reinsur-

ance of London, Ltd. Travelers is The Travelers Indemnity Company of Illinois.

ture of statute and not a private insurer, the Authority argues its obligations to participating schools are solely statutory and it can violate only statutory obligations. It argues further that, not only does it not enter into insurance contracts with participating schools, it has no statutory authority to do so. The Authority concludes that, since Moriarty sought relief outside of the Act through a civil action in contract or tort against the Authority, Moriarty's action is foreclosed by the doctrine of sovereign immunity. *See* NMSA 1978, § 37–1–23(A) (1976) (immunity in contract unless valid written contract); NMSA 1978, § 41–4–17(A) (1982) (immunity in tort unless waived).

{10} The Authority's second major line of attack is that a determination by the district court of the Authority's coverage obligation would be unconstitutional under the separation of powers doctrine. *See* N.M. Const. art. III, § 1. The court would be exercising a core function of an administrative agency created by the Legislature. *See Fellows v. Shultz*, 81 N.M. 496, 499–500, 469 P.2d 141, 144–45 (1970); *Cont'l Oil Co. v. Oil Conservation Comm'n*, 70 N.M. 310, 325, 373 P.2d 809, 819 (1962). If not unconstitutional, the Authority continues, the district court action should be rejected under the doctrine of judicial prudential restraint in order "to preserve the delicate balance of power between our political institutions," in reliance on *N.M. Right to Choose/NARAL v. Johnson*, 1999–NMSC–005, ¶¶ 12–13, 126 N.M. 788, 975 P.2d 841 (stating the exercise of discretion to confer standing on claimants who seek to assert claims on behalf of third parties "should be guided by prudential considerations"). Therefore, the Authority asserts, if Moriarty was entitled to any district court judicial scrutiny of the Authority's actions, that scrutiny could only be under the scope of review for administrative decisions under a constitutional writ of certiorari issued by the district court. *See* N.M. Const. art. VI, § 13; *Coe v. City of Albuquerque*, 76 N.M. 771, 774, 418 P.2d 545, 547–48 (1966) (restricting extent of certiorari review restricted to questions of law, including whether administrative body acted fraudulently, arbitrarily, or capriciously, whether the order was supported by substantial evidence, and whether the action was within the scope of authority). The Authority's coup de grace, however, is that Moriarty nevertheless lost any right to seek certiorari because it failed to timely file a petition for issuance of a writ.

{11} Moriarty's ultimate goal is to recover full indemnity based on the policy obligations of both the Authority and the private insurers. Moriarty's view is that it should be up to the Authority and the insurers to iron out the extent to which their respective levels of coverage are obligated. Moriarty is concerned that if the Authority is dismissed and the action proceeds only against the private insurers, the ultimate finding regarding those insurers' excess coverage obligations may leave Moriarty short of full indemnity, without any ability to pursue the Authority for further self-retention amounts for which the Authority could be obligated.

{12} The Authority's ultimate goal is to protect its self-insured retention pool by making its own determination of the extent of its indemnity obligation under the insurance agreements, paying only that amount, and leaving it up to Moriarty to recover the remainder of its unreimbursed loss from the private insurers or others.

{13} The underlying issue is whether the circumstances flowing from the exercise of statutory duty and statutory power establish a contract, the breach of which Moriarty can attempt to enforce in court against the Authority.

**C.  The Pleadings and the Standard of Review**

{14} Moriarty specifically alleges that its civil complaint "concerns the bad faith conduct of [the Authority] ... in failing to indemnify plaintiff for losses it suffered"; that the Authority "provides and procures insurance for public school[] districts in New Mexico, including Moriarty"; that the Authority "entered into agreements to provide insurance coverage to plaintiff" and "agreed to provide coverage to plaintiff"; that "[p]laintiff has performed each of the obligations and conditions required to be performed by it under its insurance agreements with [the Authority]"; that the Authority breached

"the insurance agreements"; and that the Authority "breached the duty of good faith and fair dealing" and its "fiduciary duty to plaintiff by failing and refusing to indemnify plaintiff."

{15} The Authority's counterclaim against Moriarty alleges that the Authority "provided certain insurance coverage for plaintiff," and paid Moriarty $250,000, "which is the total amount of the self-insured retention that it was required to pay for plaintiff's loss under the terms of the Travelers excess policy." Moriarty admitted in its reply to the counterclaim only that the Authority paid $250,000 to Moriarty. Moriarty mentions in one of its affirmative defenses that in making its claim it relied on "memoranda of coverage describing the insurance coverage" issued by the Authority to Moriarty.

{16} Because this case is before us on appeal of an order granting a motion to dismiss under Rule 1-012(B)(6), we do not consider any documents or evidence outside the pleadings such as, for example, the content of the Lloyd's and Travelers policies or the Authority's memoranda of coverage, or the bases on which the Authority made its determination. *See V.P. Clarence Co. v. Colgate,* 115 N.M. 471, 472, 853 P.2d 722, 723 (1993). The Authority avers in its appellate brief its determination that the Travelers policy "provided retroactive coverage ... but limited the total coverage to $250,000," and that "the Lloyd's policy, and therefore the schools' self-insurance pool, did not cover losses that remained unreported after [a certain date]." While it is a matter outside the pleadings, we consider this an acknowledgment that the Authority made its ultimate decision through application of policy language.

{17} We review the dismissals de novo. *In re Estate of Harrington,* 2000–NMCA–058, ¶ 12, 129 N.M. 266, 5 P.3d 1070 (subject matter jurisdiction); *Padwa v. Hadley,* 1999–NMCA–067, ¶ 8, 127 N.M. 416, 981 P.2d 1234 (On a Rule 1 012(B)(6) motion, "[w]e accept all well-pleaded factual allegations as true, and resolve all doubts in favor of the sufficiency of the complaint.").

### D. Sovereign Immunity

{18} Moriarty maintains its non-statutory claims all sound in contract. Because the Authority is a state governmental entity, Section 37–1–23 requires Moriarty to prove the existence of a valid written contract and permits a Rule 1–012(B)(6) dismissal if Moriarty cannot allege such a contract in its complaint against the Authority. Moriarty alleges that the Authority breached a written contract between Moriarty and the Authority.

{19} The Authority made two distinct decisions as to coverage. The first was what coverage to procure for the participating schools under its statutory obligation to "provide for ... risk-related coverage." Section 22–2–6.4. This decision was carried out through the purchase of insurance policies issued by Lloyd's and Travelers, along with whatever negotiation and determination of first and excess coverage layers was necessary. The second, based on its reading and application of the terms and conditions of the insurance policies, was to decide the Authority's ultimate indemnity obligation for Moriarty's loss. Moriarty's claim is not that the Authority breached a statutory duty in regard to providing coverage but that the Authority breached its contractual duty to fully pay a covered loss.

{20} Moriarty and the Authority both acted under mandatory provisions of the Act. That is, Moriarty paid premiums for risk coverage that the Authority supplied. Moriarty suffered a loss. The Authority made a unilateral determination of the extent of its self-insured retention obligation, placing Moriarty at risk of inadequate recovery, with no adjudicatory process through which Moriarty could make a record supporting its position on the extent of the Authority's obligation.

{21} Through its statutory power the Authority used mandatory school-paid premiums to negotiate private excess insurance coverage beyond a first layer of self-insured retention coverage. The problem arose when the Authority then determined the limit of its self-insured retention obligation. Moriarty was left on its own to look to the private insurers to recoup the remainder of

the loss, with no remedy against the Authority if a shortfall resulted from the Authority's limitation on its self-insured retention obligation. In making its determination, the Authority engaged in policy obligation decision-making that directly and adversely affected Moriarty, an insured participating member for whom the Authority both procured and provided coverage.

{22} The Authority relies on public employee pension and annual leave cases to argue the non-existence of any contractual right, because no clear and unambiguous intent to create a contractual right appears in the Act. *See Pierce v. State,* 1996–NMSC–001, ¶¶ 31, 33, 40–43, 70, 121 N.M. 212, 910 P.2d 288 (determining that state retirement statutes created vested property rights, but not contract rights, and not an irrevocable or vested tax exemption on retirement benefits; therefore, retired state employees had no claim of unconstitutional impairment of contract based on Legislature's repeal of tax exemption); *Whitely v. N.M. State Pers. Bd.,* 115 N.M. 308, 312–13, 850 P.2d 1011, 1015–16 (1993) (determining that public employees did not have contractual right supporting their claim that a legislative change in their rate of annual leave accrual constituted an unconstitutional impairment of contract).

{23} These cases considering whether legislative changes affecting public employee benefits unconstitutionally impaired contracts are not applicable here. In *Pierce* and *Whitely,* the legislative process affected a class of employee benefits equally. Here, however, the Authority, under at most an implied statutory authority, affected Moriarty's benefits through an individualized, specific determination involving a specific loss and claim of loss. Notwithstanding the Authority's concern about the financial effect on the pool based on the particular loss in this case, the action here is not legislative policy-making for a class of similarly situated persons or entities.

{24} Similarly, the Authority argues that its decisions regarding the disbursement of pooled funds is a political question to be resolved in the legislative and administrative processes, not a matter for adjudication in the court. The Authority can save pooled self-retention funds by limiting distribution within the family of state government. Thus, the extent to which the self-insured retention pool is to be reduced at any particular time is purely an administrative decision because only, and all, participating state school districts are affected by the pay out. The Authority argues the indemnity limits for any loss and how the Authority uses the self-insured retention pool are matters solely under Authority control.

{25} We are not persuaded. The purpose of the Act is to facilitate the economical provision of insurance for public schools through the Authority. The Authority is a creature of statute created in the image of an insurer. Under the Act, the Authority actually provides policies of insurance that insure the school districts. By authorizing the Authority to do so, the Act "by clear and unambiguous terms indicates that the State [can] specifically enter[] into a bargain with a party 'in fact as found in their language or by implication from other circumstances, as affected by rules of law.' " *Pierce,* 1996–NMSC–001, ¶ 17, 121 N.M. 212, 910 P.2d 288 (quoting 1 Arthur L. Corbin, Corbin on Contracts § 1.3, at 9 (rev. ed.1993)). As here, where the Authority is subject to first-party insurance claims based on, for example, a school district's loss from employee theft, we would not characterize the indemnification funds as fungible state agency monies that can be withheld from the school district and, instead, used for general resource allocation. That the Authority's underwriting or budgeting predictions might be disrupted because one school suffers an unexpectedly large loss, or that all participating school districts might suffer economically by substantial depletion of the pool due to an unanticipated loss of one school district, does not transform a contract into a legislative or executive policy.

{26} The Authority cannot escape the realm of contract. Receiving a premium, providing insurance coverage, and denying benefits indicate the existence of a valid, written, enforceable insurance contract under the Act between the Authority and Moriarty, regarding the Authority's first-party obligation. Moriarty therefore states a claim under Rule 1–012(B)(6) for breach of contract

which is not barred by sovereign immunity. We leave for determination on remand whether Moriarty can prove the existence of a valid written contract. We also leave for determination below whether the claims for breach of the implied covenant of good faith and fair dealing and fiduciary duty can be pursued in the face of Section 37-1-23.

### E. Separation of Powers

■ {27} The separation of powers issue centers on whether Moriarty can file a contract action against the Authority invoking the original jurisdiction of the district court, as opposed to being relegated solely to the appellate jurisdiction of the district court.

{28} Article VI, § 13 of the New Mexico Constitution reads:

> The district court shall have **original jurisdiction in all matters and causes not excepted in this constitution,** and such jurisdiction of special cases and proceedings as may be conferred by law, and **appellate jurisdiction of all cases originating in inferior courts and tribunals** in their respective districts, and supervisory control over the same. The district courts, or any judge thereof, shall have **power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, prohibition and all other writs, remedial or otherwise in the exercise of their jurisdiction;** provided, that no such writs shall issue directed to judges or courts of equal or superior jurisdiction.

(Emphasis added).

■ {29} "Original jurisdiction" here means general jurisdiction, which means "those matters known 'to the common law and equity practice of England prior to 1776.'" *Sanchez v. Attorney Gen.,* 93 N.M. 210, 214, 598 P.2d 1170, 1174 (Ct.App.1979) (quoting *In re Forest,* 45 N.M. 204, 207, 113 P.2d 582, 583 (1941)). As to those matters,

as well as matters in which jurisdiction is conferred by statute, district courts may take evidence, adjudicate facts, apply law, and decide the merits of a dispute in favor of one party or another. *See* Rules 1-001 to -063 NMRA 2001. *Cf. John Does v. Roman Catholic Church,* 1996-NMCA-094, ¶ 27, 122 N.M. 307, 924 P.2d 273 (discussing the issue of standing and quoting *Asplund v. Hannett,* 31 N.M. 641, 647, 249 P. 1074, 1076 (1926)) ("In our scheme of government, the function of the courts is to declare and apply the law in the·decision of justiciable controversies. We are not placed over the other departments of government, generally, to review or interfere with their acts, as the special guardian of the Constitution. Ours is the judicial power.").

{30} At the same time, Article VI, Section 13 grants district courts "appellate jurisdiction of all cases originating in inferior courts and tribunals," and also grants jurisdiction to issue various writs, including writs of certiorari. *State ex rel. Bd. of Comm'rs of State Bar v. Kiker,* 33 N.M. 6, 7, 261 P. 816, 816 (1927).

{31} The distinctions among the original, appellate and writ jurisdictions have significance in this case. The Authority contends a district court is prohibited by the constitutional separation of powers doctrine from substituting its judgment for that of the Authority and thus from hearing and deciding through its original jurisdiction the same question that was decided by the Authority. *See Coe,* 76 N.M. at 774, 418 P.2d at 547-48; *Kelley v. Carlsbad Irrigation Dist.,* 71 N.M. 464, 466-67, 379 P.2d 763, 763-64 (1963); *Cont'l Oil Co.,* 70 N.M. at 325, 373 P.2d at 819. The Authority argues that Moriarty may invoke only the district court's appellate jurisdiction and that the Authority's decision in the present case is reviewable, if at all, only pursuant to a constitutional writ of certiorari issued by the district court.[2] *See*

---

2. The Authority does not distinguish between appellate and writ jurisdiction. In *Kiker,* the district court issued a writ of certiorari to "inquir[e] whether the relator had power and jurisdiction to make the order which it did make." 33 N.M. at 7, 261 P. at 816. The Court in *Kiker* said this writ jurisdiction "is not appellate jurisdiction," but "the third class of jurisdiction, viz. a supervi-

sory control over all inferior courts and tribunals within its district." *Id.* The Court also stated that "the district courts are specifically authorized to issue ... the writ of certiorari," in the "exercise of their jurisdiction of whatever kind or nature." *Id.* This latter statement would indicate that the district court is authorized to issue writs in the exercise of its original jurisdiction and its

N.M. Const. art VI, § 13; Rule 1–075 NMRA 2001; *Roberson v. Bd. of Educ.*, 78 N.M. 297, 299–300, 430 P.2d 868, 870–71 (1967); *Concerned Residents for Neighborhood Inc. v. Shollenbarger*, 113 N.M. 667, 669, 831 P.2d 603, 605 (Ct.App.1991).

{32} Moriarty contends the district court has original jurisdiction to entertain its civil action in this case pursuant to N.M. Const. art. VI, § 13 and cannot be deprived of that right by the power exercised by the Authority. In Moriarty's view, to bar its claims would violate the separation of powers doctrine because it would effectively eliminate any meaningful judicial scrutiny of the Authority's decision. *See* N.M. Const. art. VI, § 1 (vesting judicial power in the district courts and other tribunals); N.M. Const. art. III, § 1 (explaining separation of powers); *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 173–74, 2 L.Ed. 60 (1803) (upholding the judiciary's power to act as a check on the acts of the executive branch); *Bd. of Educ. v. Harrell*, 118 N.M. 470, 480, 882 P.2d 511, 521 (1994) (discussing the importance of "an evidentiary hearing which comports with the minimum requirements of due process" in determining the type of court scrutiny permitted).

{33} As for appellate jurisdiction, Moriarty and the Authority agree there is no specific statutory right to appeal here. They also agree that no statutory right to seek a writ of certiorari exists. Therefore, NMSA 1978, § 39–3–1.1 (1999), which permits certiorari and appeal when provided by statute, is inapplicable.

{34} Independent of statute, the right to seek a constitutional writ of certiorari in the district court "will lie when it is shown that the inferior court or tribunal has exceeded its jurisdiction or has proceeded illegally," *Regents of Univ. of N.M. v. Hughes*, 114 N.M. 304, 309, 838 P.2d 458, 463 (1992), and generally not when there exists a right to appeal. *Roberson*, 78 N.M. at 300, 430 P.2d at 871; *see also Hughes*, 114 N.M. at 310, 838 P.2d at 464 (reiterating *Roberson*'s statement). Rule 1–075(A) governs but does not itself create a right to obtain a constitutional appellate jurisdiction as well as independently

writ of certiorari to an administrative entity "when there is no statutory right to an appeal or other statutory right of review." Moriarty did not file a petition for a writ of certiorari in the district court.

{35} Based on the record before us, it appears the Authority's decision was made with no hearing and no opportunity for Moriarty to present witnesses, documentary evidence, or argument, or to make a record for judicial review. Rather, the process appears to be nothing more than an insured's demand and a unilateral refusal to indemnify based on coverage defenses or internal policy. The constitutional grant of appellate jurisdiction in all cases originating in inferior courts and tribunals does not apply or preempt original jurisdiction where an administrative board does not "act as an inferior court or tribunal in denying benefits," that is, when no quasi-judicial, adjudicatory proceeding precedes the decision of the administrative board. *Rainaldi v. Pub. Employees Ret. Bd.*, 115 N.M. 650, 653, 857 P.2d 761, 764 (1993). At this point, we see no "case," nor any adjudicatory process of an inferior tribunal or court, that would limit Moriarty to appellate jurisdiction.

{36} Nor does there appear to have been "agency proceedings," with a "record on review" as contemplated under Rule 1–075(C), (H), that would permit effective review by certiorari. The constitutional certiorari process will likely not provide effective judicial scrutiny of an administrative decision in cases such as this. The Authority engaged in the interpretation and application of terms and conditions of insurance policies in deciding the extent of its obligations for Moriarty's covered loss, but there exist no administrative proceedings including an adjudicatory hearing with a record adequate for meaningful judicial review, as contemplated under Rule 1–075(C), (H).

{37} At least as the record on appeal to this Court stands, the district court properly has original jurisdiction over Moriarty's claim. This procedure comports with the adjudication of insurance claims in the private sector. Because the Authority's decision was unilateral, the original jurisdiction through its third class of jurisdiction.

in the district court does not violate the separation of powers doctrine. This gives the parties access to a hearing and adjudication that seems otherwise foreclosed.[3]

{38} The Authority is no stranger to the original jurisdiction of the district court. For example, a school district has sued for a judgment declaring the Authority had a duty to defend the school district. *Lopez v. N.M. Pub. Schs. Ins. Auth.*, 117 N.M. 207, 870 P.2d 745 (1994). Treating the Authority as an insurer, *Lopez* held that the Authority had the duty to defend until it established in the underlying lawsuit that all claims fell within an exclusion. *Id.* at 211, 870 P.2d at 749. In another case, a part-time school district employee sued the Authority to recover damages under an uninsured motorist provision of a school district insurance policy. *Lucero v. N.M. Pub. Sch. Ins. Auth.*, 119 N.M. 465, 892 P.2d 598 (1995). The Supreme Court affirmed the district court grant of summary judgment based on the Authority's defense of lack of coverage. *Id.* at 466–67, 892 P.2d at 599–600. The *Lucero* Court discussed the law of insurer and insured. The Authority has also defended several workers' compensation cases. *See, e.g., Lamay v. Roswell Indep. Sch. Dist.*, 118 N.M. 518, 882 P.2d 559 (Ct.App.1994).

{39} We do not think that the Legislature intended to bind school districts to whatever the Authority might unilaterally decide regarding coverage obligations without some kind of legal adjudication of the Authority's obligations similar to the process available had the school district obtained its own insurance and sought an adjudication of the insurer's obligations. The Act does not set out any procedure for resolution of first-party insurance disputes between a school district and the Authority when a school district loss exists. Absent a legislative intent to the contrary, a school district, as an insured, should have the opportunity to initiate an adjudicatory process on first-party

claims such as Moriarty's, with the opportunity to call witnesses, present evidence, and argue its position. *Cf. Harrell*, 118 N.M. at 480, 882 P.2d at 521 (stating that the "right of access to the courts may be satisfied by an evidentiary hearing which comports with the minimum requirements of due process"). Without legislation that provides or enables an administrative hearing or arbitration process, a school district can look only to a district court's original jurisdiction for an effective adjudication.

{40} Moriarty's first-party insurance contract claim against the Authority, which fails to implicate Rule 1–012(B)(6), may be pursued within the district court's original jurisdiction. To the extent Moriarty's other claims sounding in contract and seeking a contract-damages remedy are determined on remand to be legally cognizable, they, too, may be pursued within the district court's original jurisdiction.

### F. The Statutory Claims

{41} Moriarty seeks relief against the Authority under both the Insurance Code and the Unfair Practices Act. We choose not to address these claims in this appeal except to reverse the district court's dismissal of them under Rule 1–012(B)(1) or Rule 1–012(B)(6). The viability of these claims is better tested on summary judgment after Moriarty has developed the facts in the context of the various claims and defenses.

### G. The Authority's Motion for Supplemental Briefing

{42} After oral argument before this Court, the Authority filed a motion requesting supplemental briefing. Based on what the Authority perceived at oral argument as this Court's apparent concern about the state and nature of the record regarding the Authority's coverage determination, the Authority attaches to its motion regulations that it

---

**3.** We leave for another day whether, if the Authority had an administrative adjudicatory process for first-party claims such as Moriarty's, the doctrine of separation of powers would require a school to exhaust that process and seek judicial relief from an adverse administrative decision pursuant to a constitutional writ of certiorari.

We also neither explore nor decide whether claims for breach of the duty of good faith and fair dealing or breach of fiduciary duty would be viable in an administrative adjudicatory proceeding or could be asserted separately in an action seeking to invoke the original jurisdiction of the district court.

adopted or that were effective June 29, 2000, relating to and creating an "Administrative Appeal of Authority Coverage Determinations." *See* NMAC § 60.50.16. We deny the motion. The new regulation does not apply to this case. Further, we decline the Authority's invitation at this late stage to remand to the Authority to permit it now to hold an evidentiary hearing and adjudicate the substantive issues. Moriarty filed suit on July 26, 1996. This regulation providing for hearings and administrative records and a procedure for appeal by certiorari is dated June 29, 2000. The Authority did not bring the regulation to the attention of this Court until its motion for supplemental briefing filed on July 10, 2001.

**CONCLUSION**

{43} We reverse and remand for further proceedings in the district court consistent with this opinion.

{44} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Judge, and CYNTHIA A. FRY, Judge.