# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>December 17, 2014</u>

**NO. 31,704**

**EL CASTILLO RETIREMENT
RESIDENCES,**

     Petitioner-Appellee,

v.

**DOMINGO MARTINEZ, ASSESSOR,
SANTA FE COUNTY,**

     Respondent-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Barbara J. Vigil, District Judge**

Jones, Snead, Wertheim & Clifford, P.A.
Carol A. Clifford
Santa Fe, NM

for Appellee

Bridget A. Jacober
Santa Fe, NM

for Appellant

## OPINION

**ZAMORA, Judge.**

{1} Domingo Martinez, Santa Fe County Assessor (the Assessor), appeals a district court order granting El Castillo Retirement Residences (El Castillo) a charitable property tax exemption pursuant to Article VIII, Section 3 of the New Mexico Constitution and the New Mexico Property Tax Code, NMSA 1978, Section 7-36-7(B)(1)(d) (2008). As a result of the Assessor's failure to perfect his appeal as to the statutory exemption, we do not have jurisdiction to review whether El Castillo is entitled to a charitable property tax exemption under Section 7-36-7(B). We further conclude that El Castillo does not meet the constitutional requirements for a charitable property tax exemption, and therefore reverse on this issue.[1]

## BACKGROUND

{2} El Castillo, a Santa Fe continuing care retirement community, filed a claim for a charitable property tax exemption that was denied by the Assessor. El Castillo appealed that decision to the Santa Fe County Valuation Protests Board (the Protests Board), claiming a charitable property tax exemption under Section 7-36-7(B) and

---

[1]We recognize that this opinion reaches a different result from our opinion in *La Vida Llena v. Montoya*, 2013-NMCA-048, 299 P.3d 456. *Llena*, however, proceeded only statutorily pursuant to this Court's analysis of Section 7-36-7(B). *Id.* ¶8. There was no constitutional challenge asserted by the Assessor.

under Article VIII, Section 3. The Protests Board determined that El Castillo was ineligible for the exemption under Section 7-36-7(B). The Protests Board, however, declined to decide whether El Castillo qualified for the exemption under Article VIII, Section 3, citing a lack of jurisdiction.

{3}     El Castillo appealed to the district court, requesting that the Protests Board's decision to deny El Castillo's claim for a charitable property tax exemption under Section 7-36-7(B) be reversed. El Castillo also requested that the district court exercise its original jurisdiction to grant El Castillo's constitutional claim for a charitable property tax exemption. At the time, the Assessor agreed to the district court's exercise of original jurisdiction over El Castillo's constitutional property tax exemption claim.

{4}     The parties stipulated that the record made before the Protests Board would substitute for the presentation of evidence and testimony to the district court. El Castillo's appeal was briefed and argued based on evidence presented to the Protests Board. After making original findings of fact, the district court determined that El Castillo qualified for a charitable property tax exemption under both Article VIII, Section 3 and Section 7-36-7(B). The district court's judgment was entered on September 29, 2011. The Assessor filed a notice of appeal on October 25, 2011, and a docketing statement on December 28, 2011.

**DISCUSSION**

{5}     Due to the procedural posture of this case, we first discuss whether the Assessor properly perfected his appeal. We then turn to the Assessor's jurisdictional challenge. And finally, we consider the merits of the Assessor's constitutional claim.

**I.     Perfection of the Appeal**

{6}     The Protests Board's decision and order addressed the statutory aspect of El Castillo's claim for a charitable property tax exemption but, based on a lack of jurisdiction, did not address the constitutional aspect of the claim. As a result, El Castillo's claim was separated into two distinct appellate procedural paths: (1) the statutory claim, reviewable by the district court in its appellate jurisdiction; and (2) the constitutional claim, reviewable by the district court in its original jurisdiction. *See* NMSA 1978, § 7-38-28(A) (1999) ("A property owner may appeal an order made by the director or a county valuation protests board by filing an appeal pursuant to the provisions of [NMSA Section 39-3-1.1 (1999)]."); *see also* § 39-3-1.1(A) (stating that agency decisions placed under the authority of the section by specific statutory reference, are appealable to the district court); Rule 1-074(A) NMRA (stating that "appeals from administrative agencies [may be heard by] the district courts when there is a statutory right of review to the district court"); *Victor v. N.M. Dep't of Health*, 2014-NMCA-012, ¶ 24, 316 P.3d 213 ("Constitutional challenges that exceed

3

the scope of [an administrative agency's] review are subject to the original jurisdiction of the district court.").

{7} "[W]hen a district court has exercised both its appellate and original jurisdiction, the appellant should pursue an appeal by filing a Rule 12-505 [NMRA] petition to address issues stemming from the exercise of the district court's appellate jurisdiction, and a direct appeal to address issues stemming from the exercise of the district court's original jurisdiction." *Victor*, 2014-NMCA-012, ¶ 18 (internal quotation marks and citation omitted). An appeal to this Court from a judgment of the district court in its original jurisdiction is perfected by filing a notice of appeal and a docketing statement. *See* Rule 12-202(A) NMRA (stating that a notice of appeal shall be filed with the district court); Rule 12-208(A) NMRA (stating that the docketing statement shall be filed in the Court of Appeals). This Court's review of an administrative decision appealed to the district court is by writ of certiorari. *Georgia O'Keefe Museum v. Cnty. of Santa Fe*, 2003-NMCA-003, ¶ 25, 133 N.M. 297, 62 P.3d 754; *see* § 39-3-1.1(E) (permitting a party to petition the Court of Appeals for a writ of certiorari to review the district court's decision in an administrative appeal); Rule 12-505(A)(1) (stating that the Court of Appeals reviews district court decisions that address administrative proceedings pursuant to Rule 1-074, Rule 1-077 NMRA, or Section 39.3.1.1); *see* Rule 12-505(B) ("A party . . . may

4

seek review of the [district court's] order by filing a petition for writ of certiorari with the Court of Appeals.").

{8}    In this case, the Assessor filed a notice of appeal and a docketing statement which were sufficient to perfect the appeal of the constitutional issue heard by the district court in its original jurisdiction. However, the Assessor failed to file a petition for writ of certiorari to perfect his appeal as to the statutory issue first decided by the Protests Board and reviewed by the district court in its appellate jurisdiction.

{9}    In some instances, a non-conforming document may be accepted as a petition for writ of certiorari, if it provides sufficient information. *Wakeland v. N.M. Dep't of Workforce Solutions*, 2012-NMCA-021, ¶ 7, 274 P.3d 766. While a notice of appeal will not suffice, "[a] docketing statement will generally substantially comply with Rule 12-505 so as to permit this Court to review it as a substitute for a petition for writ of certiorari." *Wakeland*, 2012-NMCA-021, ¶ 16. In order to be considered as a timely non-conforming petition for writ of certiorari, the docketing statement must be filed within thirty days of the district court's judgment or order because "the time requirement for filing a petition for writ of certiorari is a mandatory precondition to the exercise of an appellate court's jurisdiction to review a petition on its merits." *Id.* ¶ 18.

{10}     In light of *Wakeland*, we construe the Assessor's docketing statement as a non-conforming petition for writ of certiorari. However, the Assessor filed his docketing statement on December 28, 2011, which was ninety days after the district court entered its order dismissing the complaint.[2] Therefore, although we accept his docketing statement as a non-conforming petition for writ of certiorari, it was untimely under Rule 12-505(C).

{11}     When a petition for writ of certiorari is untimely, this Court will not excuse untimely filing "absent a showing of the kind of unusual circumstances that would justify an untimely petition." *Wakeland*, 2012-NMCA- 021, ¶ 20. Untimely filing of a petition for writ of certiorari may be justified by unusual circumstances such as: "when (1) there is error on the part of the court[;] or (2) when the filing is not very late, and there are other unusual circumstances that were not caused by the court system but that were not within the control of the party seeking appellate review." *Mascareñas v. City of Albuquerque*, 2012-NMCA-031, ¶ 23, 274 P.3d 781 (internal quotation marks and citation omitted). The Assessor does not argue the existence of unusual circumstances that would justify an untimely petition, and we are aware of none.

---

[2]The thirty-day deadline would have run on October 29, 2011. The Assessor filed an unopposed request for an extension of time in which to file the docketing statement on November 17, 2011, which was also untimely.

6

{12} Accordingly, we deny the Assessor's petition for writ of certiorari. As a result, we do not have jurisdiction to review the question of whether El Castillo is entitled to a charitable property tax exemption under Section 7-36-7(B). This appeal is therefore limited to the constitutional issue decided by the district court in the exercise of its original jurisdiction. *See Mascareñas*, 2012-NMCA-031, ¶ 24 ("This Court lacks jurisdiction to address the merits of [the] administrative appeal because the appeal was untimely and unusual circumstances do not justify the untimeliness.").

## II.    Assessor's Constitutional Issue

{13} The Assessor's remaining issue is whether El Castillo meets the constitutional requirements for a charitable property tax exemption. Within that issue, the Assessor argues that the district court did not have original jurisdiction to consider the constitutional exemption and that subject matter jurisdiction is fundamentally encompassed within that determination. Initially, we note that our district courts are recognized to be courts of general jurisdiction. *Ottino v. Ottino*, 2001-NMCA-012, ¶ 6, 130 N.M. 168, 21 P.3d 37. Each has "original jurisdiction in all matters and causes not excepted in [the Constitution of the State of New Mexico], and such jurisdiction of special cases and proceedings as may be conferred by law, and appellate jurisdiction of all cases originating in inferior courts and tribunals in their respective districts." N.M. Const. art. VI, § 13. Whether a court has jurisdiction to

7

hear a particular matter is a question of law that we review de novo. *Smith v. City of Santa Fe*, 2007-NMSC-055, ¶ 10, 142 N.M. 786, 171 P.3d 300. We review constitutional issues of law de novo. *State v. Druktenis,* 2004-NMCA-032, ¶ 14, 135 N.M. 223, 86 P.3d 1050.

**A.     The District Court's Original Jurisdiction**

{14}     Initially, we must address the question of whether the district court had subject matter jurisdiction to hear El Castillo's constitutional claims. The Assessor had consented to the district court's exercise of original jurisdiction. It was not until he appealed to this Court that the Assessor first raised the issue of whether the district court had subject matter jurisdiction over the constitutional claims. An objection to the district court's subject matter jurisdiction may be raised at any time during the proceedings and may be raised for the first time on appeal. *Chavez v. Valencia Cnty.*, 1974-NMSC-035, ¶ 15, 86 N.M. 205, 521 P.2d 1154. "Subject matter jurisdiction cannot be conferred by consent of the parties." *Id.* ¶ 14. Because a challenge to subject matter jurisdiction calls into question the power of the district court to hear and decide the case before it, it is now well-settled that a lack of subject matter jurisdiction cannot be waived or cured by the consent of the parties. *Gonzales v. Surgidev Corp.*, 1995-NMSC-036, ¶ 11, 120 N.M. 133, 899 P.2d 576. "The question of whether a court has subject matter jurisdiction is a question of law which we

review de novo." *Palmer v. Palmer*, 2006-NMCA-112, ¶ 13, 140 N.M. 383, 142 P.3d 971.

{15} "Without question, the district court has the authority to consider constitutional claims in the first instance." *Maso v. State of N.M. Taxation & Revenue Dep't, Motor Vehicle Div.*, 2004-NMCA-025, ¶ 14, 135 N.M. 152, 85 P.3d 276, *aff'd* 2004-NMSC-028, 136 N.M. 161, 96 P.3d 286. In the context of administrative appeals, this Court has held that constitutional questions outside the scope of an administrative agency's review are "subject to the original jurisdiction of the district court." *Victor*, 2014-NMCA-012, ¶ 24.

{16} Before we can address the original jurisdiction question, our analysis at this juncture is to ascertain whether it is within or outside the scope of the Protests Board's review to decide if El Castillo qualified for the exemption under Article VIII, Section 3. Thirty-nine years ago, this Court was presented with the question of whether protests boards possess the authority to decide constitutional claims. *In re Miller*, 1975-NMCA-116, 88 N.M. 492, 542 P.2d 1182, *rev'd on other grounds by* 1976-NMSC-039, 89 N.M. 547, 555 P.2d 142. The *Miller* taxpayers argued that there were unequal assessments between their properties and comparable properties, as well as violations of the Equal Protection and Due Process clauses of the Fourteenth Amendment to the U.S. Constitution and Article II, Section 18 of the New Mexico

9

Constitution (1953). *Miller*, 1975-NMCA-116, ¶¶ 41, 42. The protests board took the position that it did not have the statutory authority to decide constitutional questions. *Id.* ¶¶ 43, 45. At the time of the *Miller* decision, the protests board's duties were to "hear and decide protests from persons protesting valuations of property for property taxation purposes made by county assessors and protested under [NMSA 1953, S]ection 72-2-37." *Miller*, 1975-NMCA-116, ¶ 44; NMSA 1953, § 72-2-38(D) (Cum. Supp. 1973). NMSA 1953, Sections 72-2-37(A), (B) (Cum. Supp. 1973) allowed a person to protest the valuation placed upon his property by the assessor by filing a petition with the assessor and stating why they believed the valuation was incorrect, and what they believed to be the correct valuation. *See also Miller*, 1975-NMCA-116, ¶ 44. This Court found that the then existing statutory language gave the "boards the *duty* to hear a protest of valuation of a taxpayer's property on *any grounds whatsoever*[,]" including "allegedly unconstitutional discrimination." *Id.* ¶ 46 (emphasis added). In *Miller*, we reasoned that to hold otherwise would prevent a party "from arguing before the board that the valuation was incorrect because it was . . . unconstitutional." *Id.* ¶ 45.

{17}     Interestingly, ten months prior to our decision in *Miller*, our Supreme Court noted that the Constitution was the "supreme law" of the land and held that it is the judiciary's "function and duty to say what the law is and what the Constitution

means." *Dillon v. King*, 1974-NMSC-096, ¶¶ 27, 28, 87 N.M. 79, 529 P.2d 745. The *Dillon* plaintiff was challenging the constitutionality of an election statute and the legislative process of its successor. We view this to indicate our Supreme Court's directive that constitutional determinations rest exclusively within the purview of the judiciary, and not entities such as protests boards. *Miller* did not discuss or address *Dillon*, and we are today left to reconcile the seeming disparity in these two outcomes. With this in mind, we turn to other cases in which administrative agencies have been presented with constitutional questions, as well as the current statutory appellate process for protests boards.

{18}    New Mexico appellate decisions which include cases where subject matter jurisdiction was not expressly provided by statute and where our Supreme Court interpreted the statute in a manner that allowed for the exercise of subject matter jurisdiction in a given tribunal or administrative proceeding do not give a clear direction in this case. *See Schuster v. State of N.M. Taxation & Revenue Dep't, Motor Vehicle Div.*, 2012-NMSC-025, ¶ 19, 283 P.3d 288 (holding that the motor vehicles division, within the course of the administrative hearing, must make a determination as to the constitutionality of the police activity leading to an arrest, as well as a determination as to the constitutionality of the arrest itself); *see also Maso*, 2004-NMCA-025, ¶ 12 (holding that the motor vehicle division, as an administrative body,

did not have subject matter jurisdiction to consider the constitutional question raised, as it was a matter that exceeded the scope of the enacting statute). Other New Mexico cases in which similar analyses were undertaken reached opposite conclusions regarding subject matter jurisdiction, such as where an administrative agency was presented with questions of the constitutionality of a legislative act or the constitutionality of the process set forth by an act. *See Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 1, 122 N.M. 524, 928 P.2d 250 (noting that the Workers' Compensation Administration did not have the authority to determine the constitutionality of the Act); *Victor*, 2014-NMCA-012, ¶ 24 (holding that if applicable regulations do not expressly support the inference that a hearing officer can consider or rule upon the issue of the constitutionality of the process provided by the regulations, such an inquiry exceeded the hearing officer's scope of review). Given these divergent rulings within our own appellate case law, a clear direction is not found for the purpose of our immediate inquiry. Therefore, we closely examine the enacting legislation applicable to protests boards.

{19} The current statutory process for appealing the county assessor's denial of a tax exemption is set forth in the Administration and Enforcement of Property Taxes. NMSA 1978, § 7-38-1 to -93 (1973, as amended through 2013). A property owner may appeal the county assessor's denial of a claim for an exemption. Section 7-38-

12

24(A). The current statutory provision has expanded the petition requirements from just the valuation protests. It now includes protests of incorrect denials of an exemption claim and what the property owner believes should be the exemption. Section 7-38-24(B)(3). Each county valuation protests board consists of three voting members, all qualified electors of the county, with at least one of them possessing demonstrated experience in the field of property valuation. Section 7-38-25(A). An additional member is required to be a property appraisal officer employed by the department as well as the chairman of the board. Section 7-38-25(A)(3).

{20}   Pursuant to § 7-38-25(D), the county valuation protests board's duties are to "hear and decide protests of determinations made by county assessors and protested under Section 7-38-24" ("protesting values, classifications, allocation of values and denial of exemption or limitation on increase in value determined by the county assessor"). The protest hearings before the board are not subject to the rules of evidence or the rules of civil procedure. Section 7-38-27(A). The board is required to enter an order, and that order has the same force and effect as a judgment from a court. Section 7-38-27(B), (D); *Petersen Props. v. Valencia Cnty. Valuation Protests Bd.*, 1976-NMCA-043, ¶ 18, 89 N.M. 239, 549 P.2d 1074.

{21}   As stated earlier, the question before us is whether the statutory language of Sections 7-38-24(B)(3) and 7-38-25(D) allows for constitutional interpretation by a

county protests board. "Statutory interpretation is a question of law, which we review de novo." *State v. Smith*, 2009-NMCA-028, ¶ 8, 145 N.M. 757, 204 P.3d 1267 (internal quotation marks and citation omitted). "Our primary goal when interpreting a statute is to give effect to the Legislature's intent, which is determined by looking at the plain language used in the statute, as well as the purpose of the underlying statute." *State v. Parrish*, 2013-NMCA-066, ¶ 6, 304 P.3d 730, *cert. denied*, 2013-NMCERT-004, 301 P.3d 858. "When the words used are plain and unambiguous, we give a statute its literal reading, unless that reading would lead to an injustice, absurdity, or contradiction." *Id.* (internal quotation marks and citation omitted).

{22} Based on the statutory language that identifies the responsibilities of protests boards, considered alongside the cases we have examined, we conclude that it would be inappropriate to hold that, because the protests boards have the general duty to hear and decide protests of a denial of a claim of exemption, this duty automatically includes substantive constitutional issues that have the same force and effect as a judgment of the court. To the contrary, by identifying the judiciary's function as the determinant of that which constitutes the supreme law of the land—the Constitution—the *Dillon* court guaranteed constitutional litigants that judges, and not protests board members with realty backgrounds, hear and decide constitutional issues. In those instances where the parties present constitutional issues outside of the

14

protests board's statutory authority and topical expertise, they retain the opportunity to present their argument to the district court. We therefore agree with and adhere to the principle advanced by the *Dillon* court: it is the duty of the judiciary to interpret the Constitution, the supreme law of the land, and to set forth the law. 1974-NMSC-096, ¶ 28.

{23}     While protests boards certainly have the professional competence to make decisions as to property valuations, classifications, or statutory exemptions, they lack the professional expertise to make legal determinations involving our state Constitution, especially where we have held that the decisions of a protests board shall have the same force and effect as a court-issued judgment. *Petersen Props.*, 1976-NMCA-043, ¶ 18. We conclude that El Castillo's constitutional claims exceeded the Protests Board authority of review and that it was appropriate for the district court to exercise its original jurisdiction over such claims. As a result, we further conclude that *Miller* is overruled. *See Trujillo*, 1998-NMSC-031, ¶ 34, 125 N.M. 721, 965 P.2d 305 (noting, in relevant part, that before overturning precedent, we must consider "whether the principles of law have developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine[ ]" and "whether the facts have changed in the interval from the old rule to reconsideration so as to

have robbed the old rule of justification" (internal quotation marks and citation omitted)).

{24} The Assessor further argued that the district court did not have jurisdiction to make original findings of fact. Relying on *Smith v. City of Santa Fe*, 2007-NMSC-055, 142 N.M. 786, 171 P.3d 300, the Assessor argues that El Castillo's request that the district court exercise its original jurisdiction to decide the constitutional issue not reached by the Protests Board was tantamount to a request for a declaratory judgment and that the district court lacked jurisdiction to make original findings of fact. We disagree. The Assessor's reliance on *Smith* in support of his argument is misplaced. In *Smith*, one set of plaintiffs filed an administrative action, the other set of plaintiffs did not. *Id.* ¶ 4. All the plaintiffs filed a declaratory judgment action in district court four months after the unfavorable administrative decision. *Id.* ¶ 5. The Supreme Court held that those plaintiffs that pursued the administrative relief were required to pursue a timely appeal under Rule 1-075 or, at a minimum, initiate a declaratory action within the same time frame. *Smith*, 2007-NMSC-055, ¶ 24. The Court further held that those plaintiffs that did not pursue administrative relief presented the district court with a pure question of law and the declaratory judgment action was therefore appropriate. *Id.* ¶ 27.

{25}     El Castillo's unopposed request that the district court exercise its original jurisdiction to decide the constitutional issue not reached by the Protests Board does not circumvent the administrative process. The issue was appealed to the district court through the appropriate administrative process and there are procedural and substantive differences between jurisdiction to address administrative claims and original jurisdiction to address constitutional claims. *See Victor*, 2014-NMCA-012, ¶ 26 (stating that a direct appeal of constitutional issues did not circumvent the procedure established by the applicable rules, instead it followed the rules).

{26}     Where a district court exercises its original jurisdiction, it, as fact finder, is within its purview to enter original findings of fact and conclusions of law. *See Moriarty Mun. Sch. v. N.M. Pub. Sch. Ins. Auth.*, 2001-NMCA-096, ¶ 29, 131 N.M. 180, 34 P.3d 124 ("Original jurisdiction here means general jurisdiction, which means those matters known to the common law and equity practice . . . . As to those matters, as well as matters in which jurisdiction is conferred by statute, district courts may take evidence, adjudicate facts, apply law, and decide the merits of a dispute in favor of one party or another." (internal quotation marks and citations omitted)).

{27}     Accordingly, we conclude here that the district court had both the authority to exercise its original jurisdiction and subject matter jurisdiction over the constitutional questions raised by El Castillo's claim for a charitable property tax exemption.

Therefore the district court, acting as fact finder, did not err by making original findings of fact.

**B.     Requirements for Constitutional Charitable Property Tax Exemptions**

{28}     We now address whether El Castillo meets the constitutional requirements for a charitable property tax exemption under our Constitution. "The most important consideration for us is that we interpret the [C]onstitution in a way that reflects the drafters' intent." *State v. Lynch*, 2003-NMSC-020, ¶ 24, 134 N.M. 139, 74 P.3d 73. The rules of statutory construction also apply to the construction of constitutional provisions. *Id.* We must, however, remember that the rules of statutory construction only assist in the determination of the drafters' intent and purpose. *Id.* When we interpret constitutional provisions, we must also be ever mindful of the intrepretation's present and future applications and make the interpretation accordingly.

{29}     Article VIII, Section 3 of the New Mexico Constitution states that "all property used for educational or charitable purposes . . . shall be exempt from taxation." "The purpose of the charitable exemption is to encourage charitable activities by providing them with tax relief, and to thereby promote the general welfare of society." *Sisters of Charity v. Cnty. of Bernalillo*, 1979-NMSC-044, ¶ 13, 93 N.M. 42, 596 P.2d 255. However, "[t]he countervailing consideration is to limit the exemption within

reasonable bounds so as to minimize the shift of the tax burden to non-exempt property owners." *Id.*

{30} The determinative factor for property tax exemptions is the use of the property; "[t]he declared objects and purposes of the owner are not determinative." *Georgia O'Keefe Museum*, 2003-NMCA-003, ¶ 40. "The fact that the purpose of an organization may be charitable . . . is not conclusive of whether the entity is entitled to an exemption from taxation." *Cottonwood Gulch Found. v. Gutierrez*, 1985-NMCA-042, ¶ 18, 102 N.M. 667, 699 P.2d 140. In evaluating the plaintiff's exemption claim, the court will consider "[t]he direct and immediate use of the property rather than the remote and consequential benefit derived from its use." *Pecos River Open Spaces, Inc. v. Cnty. of San Miguel*, 2013-NMCA-029, ¶ 10, ___ P.3d ___ (internal quotation marks and citation omitted).

{31} To qualify for the charitable property tax exemption, the property must be "used primarily and substantially for charitable . . . purposes in a manner that benefits the public." *Id.* ¶ 9 (omission in original) (internal quotation marks and citation omitted). "Although our constitutional provision does not require property to be used exclusively for charitable purposes in order to come within the exemption, the uses for these purposes must be substantial and must be the primary uses made of the property." *Retirement Ranch, Inc. v. Curry Cnty. Valuation Protest Bd.*, 1976-

19

NMCA-010, ¶ 7, 89 N.M. 42, 546 P.2d 1199 (internal quotation marks and citation omitted).

{32} "The exemption granted [to] . . . charitable institutions proceeds upon the theory of the public good accomplished by them and the peculiar benefits derived by the public in general from their conduct." *Pecos River*, 2013-NMCA-029, ¶ 9 (internal quotation marks and citation omitted). "[B]ecause property which is exempt from taxation does not share in the burden of paying for the cost of government . . . in exchange for its exempt status, such property must confer a substitute substantial benefit on the public." *Id.* ¶ 10 (omission in original) (alterations, internal quotation marks, and citation omitted). "A substantial public benefit means a benefit of real worth and importance to an indefinite class of persons who are a part of the public, which benefit comes to these persons from the use of property." *Id.* (alterations, internal quotation marks, and citation omitted).

{33} In *Mountain View Homes, Inc. v. State Tax Commissioner*, 1967-NMSC-092, ¶ 15, 77 N.M. 649, 427 P.2d 13, our Supreme Court held that a housing development built by a non-profit corporation for moderate to low income families, was not entitled to a charitable property tax exemption. Though the development did not generate a profit, its residents were not sick or indigent and did not receive welfare. *Id.* The development was self-supporting, generating enough rental income to cover

its costs. *Id.* "It is clear that rents are fixed at an amount necessary to pay the interest, amortize the principal and pay all expenses of maintaining the property." *Id.* The Court concluded that the development "was intended to be self-supporting, without any thought that gifts or charity were involved" and that property used in such an operation "would not have been considered charitable when our [C]onstitution was adopted." *Id.*

{34}    In the context of charitable property tax exemptions for nursing homes, this Court has held that a nursing home was entitled to a charitable property tax exemption because "a facility used for the purpose of caring for the aged sick and infirm would traditionally fall within the category of charitable purpose." *Retirement Ranch*, 1976-NMCA-010, ¶ 6. In that case, the nursing home claiming the charitable property tax exemption served a "sick and largely indigent" population. *Id.* Fifty-five percent of the home's residents were Medicare and Medicaid patients. *Id.* ¶ 9. The payments collected from Medicare and Medicaid "never covered the cost of the services rendered." *Id.* And, although the home's board of directors could have lessened the home's annual deficit by admitting a greater percentage of private-pay patients, it chose not to as a matter of policy "because of the large number of [M]edicare and [M]edicaid recipients in the area who needed care." *Id.* We held that these facts were sufficient to establish the home was being substantially utilized for

21

the public to benefit from its charitable purpose and we reversed the protests board's denial of the charitable property tax exemption. *Id.* ¶ 10.

{35} Here, El Castillo argues that through donations and subsidies to its residents, it relieves the larger community of the cost of their care, thereby conferring a benefit to the public sufficient to qualify it for a charitable property tax exemption. El Castillo purports to donate or subsidize its residents in three ways: (1) by donating its facilities for educational, religious, and cultural activities; (2) by subsidizing costs for residents who cannot afford the cost of their residency and care; and (3) by providing support for resident monthly fees from a Resident Assistance Fund. We are not persuaded that these acts qualify for the tax exempt status provided for within the Constitution.

{36} El Castillo is structured to be a self-sustaining retirement community. It is self-contained, funded entirely by resident fees. Residents, for the most part, enter El Castillo through "independent living" which is comparable to living in an apartment. As residents age, El Castillo provides graduated levels of care, including assisted living and nursing facilities.

{37} El Castillo exclusively serves individuals who meet certain physical, mental, and financial requirements. El Castillo's prospective applicants must disclose health issues that create "an unacceptably high risk that [the resident] will require a degree

22

of care that may jeopardize the financial soundness of the [c]ommunity's self-insured health program." El Castillo does not accept Medicare or Medicaid recipients; it limits admittance to individuals that have a net worth of at least $300,000, independent of any social security benefits. Once accepted for admission, El Castillo residents pay entry fees ranging from $100,000 to $300,000 in addition to monthly fees ranging from $1,800 to $3,200. In its residence agreement, El Castillo agrees to provide services and amenities to its residents, including coordinated social and recreational activities, as well as use of the dining room, resident lounge, multipurpose facilities, library, patios, fitness, laundry, and landscaped areas. Payment for these services and amenities is covered by the residents' monthly fees.

## 1. Facilities Donation

{38} El Castillo claims that use of its facilities is donated to residents because by allowing its residents to use the facilities, El Castillo is foregoing income it could generate by renting the facilities to outside groups for meetings or other types of activities. To calculate the value of the facilities donated, El Castillo contacted hotels near the El Castillo campus to determine the hourly rates for which these hotels rented their meeting rooms and facilities. Then El Castillo calculated the total number of hours its residents used its common facilities, and multiplied the number of hours by hourly rates comparable to the local hotels' rates. Using this method, El Castillo

23

determined that in 2009, the tax year for which it seeks the exemption, it had foregone possible rental income for those facilities in the amount of $40,730. Yet we note that El Castillo residents are entitled to the use of El Castillo's facilities as part of the residence agreement. Their resident fees are used to provide amenities such as the use of facilities by the residents. It is therefore disingenuous and contrary to reason for us to contemplate that a resident's use of El Castillo's facilities is a donation. We conclude that a resident's use of El Castillo's facilities is not a donation, but rather an amenity paid for as part of their residential agreement with El Castillo.

**2.       Resident Subsidies**

{39}      El Castillo also claims that it charitably subsidizes the cost of residency and care for residents that can no longer afford these costs. Prior to admittance, each resident's entry fee and monthly fees are actuarially calculated based on the type of unit the resident will occupy, the level of care required, and the life expectancy of the resident. When a resident lives longer than anticipated by the actuary, the overall cost of that resident's residency and care may exceed the revenues El Castillo receives from the resident. El Castillo claims that in 2009, it donated services to 28 such residents.

{40}      To determine the total amount of the claimed subsidy, El Castillo calculated its total operating costs per year. It then divided this figure by the number of total

24

residents to determine the average cost per resident, per year. For 2009, that amount was $45,308. The number of long-term residents who generated less than $45,308 of amortized income for El Castillo were considered to be subsidized. For 2009, El Castillo claims it subsidized $903,922 of resident costs in this way. However, El Castillo failed to include or consider in its calculations the amount of revenue it received from residents who died sooner than anticipated by the actuary, and whose entry fees and monthly fees paid exceeded the cost of residency and care. Because no moneys in the Resident Assistance Fund were used during the 2009 tax year to assist residents in financial need, it can only be presumed that the overall cost per resident calculation balanced out the actuary model being utilized by El Castillo. As a result, we conclude that El Castillo's claimed resident subsidy of $903,922 was neither complete nor accurate and we will not speculate as to what amount, if any, of El Castillo's subsidy calculation can be considered a charitable donation.

**3.     Resident Assistance Fund**

{41}     El Castillo's third claimed donation to residents is financial aid for residents who are unable to pay their monthly fees. For this purpose, El Castillo has established a Resident Assistance Fund which consists of funds set aside from entrance fees and monthly fees. El Castillo claims that from 2004 to 2009, it donated $61,826 to

residents from the Resident Assistance Fund. However, in 2008 and 2009, El Castillo did not assist any residents from this fund.

{42} El Castillo is providing a limited general type of public benefit because it provides housing, health care services and other amenities to its aging sick and infirm residents. However, similar to the development in *Mountain Homes*, El Castillo is designed to be a self-supporting enterprise, with both admission and monthly fees calculated to generate enough income to cover all of its operating costs, plus additional reserves that are placed in the Resident Assistance Fund. As a result, when El Castillo provides what it describes as a subsidized benefit to a resident, it has already attempted to calculate this short-fall within the paid financial structure of its overall actuarial business model. To the extent that El Castillo argues that it benefits the public by caring for residents who would otherwise receive public assistance, we disagree. The evidence establishes that it caters instead to predominately wealthy individuals who pay substantial admission fees as well as substantial monthly fees for the time period that they are anticipated to be living at the retirement facility. No evidence was presented to show that any of its residents were qualified to receive public assistance, particularly during the tax years that it sought a property tax exemption.

{43} El Castillo argues that by paying for those residents who can no longer pay for their housing and care, the Resident Assistance Fund will prevent the cost of care for that individual from shifting to the general public. To the contrary, if El Castillo were given the tax exemption for the years of 2008 and 2009, such an exemption would far exceed the actual charitable contribution amount paid on behalf of residents from the fund during that time period, which was zero. *See Pecos River*, 2013-NMCA-029, ¶ 10 (holding that in exchange for not sharing in the cost of government, the direct and immediate use of the property must confer a substitute substantial benefit to an indefinite class of persons of the public).

{44} We conclude that during the tax years at issue El Castillo did not directly and immediately use its property primarily and substantially for a charitable purpose recognized under Article VIII, Section 3 of the New Mexico Constitution because it does not confer a substantial benefit of real worth and importance to an indefinite class of persons who are members of the general public.

**CONCLUSION**

{45} For the foregoing reasons, we reverse the district court.

{46} **IT IS SO ORDERED.**

_____
**M. MONICA ZAMORA, Judge**

**WE CONCUR:**

_____
**TIMOTHY L. GARCIA, Judge**


_____
**J. MILES HANISEE, Judge**